[Cite as *State v. Oghojafor*, 2023-Ohio-44.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-07-080 |
| | : | O P I N I O N |
| - vs - | | 1/9/2023 |
| | : | |
| FIDELIS O. OGHOJAFOR, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-12-1532


Michael T. Gmoser, Butler County Prosecuting Attorney, and John Heinkel, Assistant Prosecuting Attorney, for appellee.

Charles H. Bartlett, Jr., for appellant.



**BYRNE, J.**

{¶ 1} Fidelis Oghojafor appeals from his convictions for kidnapping and domestic violence in the Butler County Court of Common Pleas. For the reasons detailed below, we affirm his convictions.

## I. Procedural and Factual Background

{¶ 2} In December 2020, a Butler County grand jury indicted Fidelis on one count each of kidnapping ("Count One"), rape ("Count Two"), felonious assault (serious physical harm) ("Count Three"), and domestic violence ("Count Four"). The indictment stemmed from allegations made by Fidelis' wife, Theresa Oghojafor. Theresa alleged that she was estranged from Fidelis, that she woke up to find him in her bed, and that he forcibly restrained and sexually assaulted her. The matter proceeded to a jury trial.

{¶ 3} Because Fidelis makes arguments involving the issue of race, we note that Fidelis is black and Theresa is white.

### A. Voir Dire

{¶ 4} During voir dire, the trial court and parties questioned potential jurors on whether any had scheduling difficulties that could make participation in the trial burdensome. Several jurors raised such concerns, including Juror 99, who stated that she was a licensed funeral director and that her absence from her family business would cause hardship. The state subsequently exercised one of its peremptory challenges on Juror 99. Fidelis objected to the state's peremptory challenge to Juror 99 because the juror was black. After the prosecutor provided race-neutral reasons for excusing Juror 99, the trial court overruled the objection and excused the juror.

### B. The Trial – Prosecution Case

{¶ 5} Because this case involves competing testimony by several witnesses, we will summarize the witnesses' testimony separately.

### 1. Theresa Fidelis

{¶ 6} Theresa testified that Fidelis was her husband. They married in 2018 but had known one another for eight or nine years.

{¶ 7} On November 6, 2020, Theresa was living at a residence in the city of

Fairfield, Butler County, with seven children. Some of those children were her biological children. Some were children of Fidelis' prior marriages. The two youngest children were "Carly" and "David."[1] Carly and David were both six years old and were Theresa's and Fidelis' biological children.

{¶ 8} Theresa testified that Fidelis was only intermittently present at the residence. He would "come in every few days. He would be gone for several days, then he would come home for a few hours, visit the kids and leave. Sometimes he would just come and go as he pleased." She considered him not living at the residence because "everything— like his daily medicine, all of his shoes, all of his work clothes, everything that's important to you and you use on a daily basis was not in the home." Theresa did not know where Fidelis was staying when he was not at the residence.

{¶ 9} Prior to November 6, 2020, the last time Theresa could recall seeing Fidelis was 15 days earlier, on October 22, 2020, which was the day after her son's birthday. She had not communicated with Fidelis since.

{¶ 10} On the evening of November 5, 2020, Carly and David were both complaining of bellyaches. Theresa, a nurse at Children's Hospital, was concerned that she might have brought COVID home from work and infected the children. She tended to the children all night. In the morning, she, Carly, and David all fell asleep in Theresa's bed. Fidelis was not in the residence when they fell asleep.

{¶ 11} When Theresa woke up, she was on her side. She felt someone pulling her panties down. She looked around and saw that Fidelis was "at the foot of me" and "on top of me." Carly and David were not in the room. She had not heard the children leave.

{¶ 12} Theresa asked, "What are you doing?" but Fidelis did not answer. He had a

---

1. We are using fictitious names to protect the children's privacy.

shirt on but was nude from the waist down. She told Fidelis, "Get off of me," turned onto her back, and started to pull her panties back up. Simultaneously, Fidelis "put his whole bodyweight on top of me." Theresa told Fidelis, "Get off of me," "don't touch me." He put his right forearm on her neck. She said that she "kept trying to pull him off of me and saying no. Get off of me. Don't touch me. I haven't seen you in days. Stay away from me. No. Please stop."

{¶ 13} Theresa testified that Fidelis continued to press his right forearm against her neck. She explained, "his right elbow would have rest on my left shoulder and his forearm across my chest and neck." Then he started "sucking" on her right breast and with his left hand he continued "to try to pull down my panties enough to have sex." Theresa said, "I just kept fighting him. His forearm kept getting tighter and tighter on my neck, so I was more focused on his arm because I was – I couldn't catch my breath. It was getting harder to breathe."

{¶ 14} Theresa testified, "I was moving my hips and – and all of his bodyweight was on me. I couldn't get him off me. I was like – kept begging him, please, get off of me. Stop. Stop. I don't want this. I don't want – I'm not – I'm not doing this. Get off of me, please. You're hurting me. I can't breathe. I turned my neck all the way to the right because I – because I couldn't breathe. And I just – I just kept fighting him and begging him."

{¶ 15} Theresa testified that she then heard David at the bedroom door. David was banging on the door, saying "Daddy, stop. Don't hurt Mommy." Theresa stated that she started to cry, whispering to Fidelis to "please stop, please stop." She then heard Carly banging on the door, "screaming for [Fidelis] to stop." At that point, she realized that her bedroom door had been locked from the inside.

{¶ 16} Theresa testified that she "just kept fighting him." And then, "at one point, I felt his fingers go into my vagina, so I just kept begging him to please stop, please stop,

- 4 -

and fighting him. And I just kept fighting and fighting and fighting and eventually I was able to get out from under him." She managed to push Fidelis off of her.

{¶ 17} She got off the bed and went out to see her children. She told them everything was okay. After the children were calm, she took a long shower, because her shoulder "hurt really bad" and because she had to go to work.

{¶ 18} When Theresa went to put on her clothes, Fidelis was sitting on the bed, "playing with his phone." She testified, "I was hurt and I said, 'why'd you do that to me?'" He did not respond and kept looking at his phone. She told him, "You really hurt me this time." He continued to not respond. She then said, "I'm done. * * * You can't do this to me. * * * Why'd you even come back? Just stay away." Fidelis finally responded, "this is my house." She replied, "I pay for it; you don't. You're never here. Just leave me alone. Just don't come back. Just come visit the kids and leave me alone." He replied that it was his house and "I'll do what I want." She alternatively described him as saying, "I could do whatever I want in this house." Theresa then said, "I'm done. You can't hurt me like this. I want a divorce." Fidelis replied, "Okay. My girlfriend has money. She'll pay for it." Theresa said, "Okay" and left.

{¶ 19} Theresa estimated that it was between 12:30 p.m. and 1:30 p.m. when she woke up with Fidelis on top of her. That day, she needed to be at work between 3:00 p.m. and 4:00 p.m.

{¶ 20} Driving to work, Theresa stated that her shoulder was "hurting," "throbbing" and that "the pain just shot up to my neck." It was a pain she had never felt before and she believed her collarbone was broken. She started crying. While passing Mercy Hospital in Fairfield, she saw the emergency sign and decided to turn in. She called her friend, Joann, who told her that she would not be able to work with a broken collarbone and convinced her to go into the hospital. Theresa went into the emergency room.

{¶ 21} While at the hospital, a police officer arrived and asked Theresa what happened. She told the officer what Fidelis had done. Subsequently, a sexual assault nurse examiner ("SANE") arrived at the hospital, met with Theresa, and conducted an assessment. During this assessment, the SANE swabbed parts of Theresa's body for DNA.

{¶ 22} Theresa testified that the medical providers at the hospital instructed her to follow up with an orthopedic surgeon as soon as possible and provided her with a referral. About two weeks after her emergency room visit, she met with the orthopedic surgeon who advised her not to lift anything and to give her shoulder time to heal. Theresa stated that as of the trial date, over six months later, she was still experiencing pain in her arm. She testified that she may have to have surgery. Theresa described various effects the injury had had on her day-to-day life. She had difficulty carrying groceries and carrying her purse. She was unable to carry a "little backpack" when she took her kids to Kings Island. She has to compensate for the pain in her left arm by using her right arm more than she normally would. She self-treats with Tylenol and certain range-of-motion exercises.

{¶ 23} Theresa explained that if it had not been for the pain she experienced, she would not have reported her allegations against Fidelis.

### 2. Joann Graham-Case

{¶ 24} Joann Graham-Case testified that she and Theresa were coworkers and that she had known Theresa since they were in nursing school together. On November 6, 2020, she recalled receiving a phone call from Theresa at 3:15 p.m. Theresa told her that Fidelis had raped her and that she had been hurt, and that her neck was hurting. Theresa told Joann that she was on her way to work. Joann told her there was no way Theresa could work with the way she was feeling and that she needed to go to the hospital. Theresa said, "I'm right here" (referring to the hospital). Joann testified that she then convinced Theresa to go into the hospital.

### 3. Amber Kelly

{¶ 25} Amber Kelly testified that she was Theresa's best friend and that they had previously worked together. She recalled Theresa contacting her via text message on November 6, 2020, at 3:30 p.m. Based on that text message, Amber went to Mercy Fairfield hospital as fast as she could. She arrived at approximately 4:30 p.m. after dropping off her son. She testified that she was the one who called police to the hospital.

### 4. Jessica Oakley

{¶ 26} Jessica Oakley testified that she was a registered nurse and was also a SANE for Butler County. On November 6, 2020, she was directed to assess Theresa at Mercy Fairfield Hospital. She arrived at 7:35 p.m. and documented her findings.

{¶ 27} Jessica described how part of her process involved obtaining an "assault history" from the patient, which history would dictate the physical examination needed to preserve potential evidence. Jessica summarized the assault history narrative that Theresa had provided her on November 6, which narrative mirrored the testimony given by Theresa during her direct examination. That narrative led to Jessica collecting various DNA samples from certain parts of Theresa's body, including a swabbing of Theresa's right nipple.

{¶ 28} Jessica testified that Theresa reported pain in her left shoulder. Jessica did not observe any visible injuries in that area.

### 5. DNA Evidence

{¶ 29} A police sergeant testified that police obtained DNA standards for Fidelis and Theresa and submitted those standards to the Ohio Bureau of Criminal Investigation. A forensic scientist with BCI testified that the swab taken from Theresa's right nipple contained Fidelis' DNA profile and that the estimated frequency of occurrence of Fidelis' DNA profile would be rarer than one in one trillion unrelated individuals.

### 6. Photographic and Documentary Evidence

{¶ 30} The state submitted photographs into evidence depicting the residence including the bedroom where the alleged offenses took place. A photograph taken at the hospital of Theresa's left shoulder area was also admitted into evidence. This photograph does not depict an obvious injury. The state further submitted medical records from Theresa's emergency room visit and from her subsequent visit with an orthopedic physician.

### C. The Trial – Defense Case

### 1. Fidelis Oghojafor

{¶ 31} Fidelis testified that he lived at the Fairfield residence with Theresa and their children. He was employed as a correctional officer at the Dayton Correctional Institute.

{¶ 32} On November 6, 2020, he was working the night shift. He arrived home from work at around 6:45 a.m. Fidelis testified that his normal, daily routine upon arriving home was to take Carly and David to school. He intended to take Carly and David to school, but he saw that Theresa was asleep in her bed and that Carly and David were with her sleeping on his side of the bed. So, he laid down on David's mattress, which was a "little mattress" on the bedroom floor, and fell asleep.

{¶ 33} Fidelis testified that he woke up at 11:15 a.m. Theresa was "lying down texting." He went to the bathroom, then he heard Carly and David downstairs. He asked Theresa, "Why they didn't go to school?" She did not respond. He then sat on the bed, tapped Theresa on her thigh, and repeated, "Why didn't they go to school?" Theresa responded, "Don't touch me, don't talk to me." Fidelis explained that he and Theresa "had some issues going on for almost three – three or four months."

{¶ 34} Theresa then got up and closed the door. Either Fidelis or Theresa said, "Let's talk." Then Theresa said, "I want a divorce." Fidelis replied, "Okay. How much will it cost?" She said, "Two grand." Fidelis said, "Okay, I'll pay." She asked how he was going to pay, and he said "The same way I've been paying the bills. That's how I'm going to pay the

divorce money."

{¶ 35} Fidelis testified that by then it was almost noon. Theresa was supposed to leave for work at 1:00 p.m. Fidelis told Theresa that he was not going to continue this conversation until Saturday, when they would have the entire day to talk about it.

{¶ 36} Fidelis stated that Theresa left for work sometime between when he saw her lying on the sofa at 1:30 p.m. and when he came downstairs after showering at 2:00 p.m. Fidelis left for work at the correctional institute at about 2:45 p.m.

{¶ 37} Fidelis denied all of Theresa's accusations. He denied touching her (other than tapping her thigh), denied assaulting her, denied holding her down, denied being naked from the waist down, and denied attempting to have intercourse with her. When asked whether he caused her any type of physical injury, Fidelis responded, "I don't beat women. I don't push. I don't – I'm cautious of these signs. I know the consequences." Fidelis summarized the extent of his interaction with Theresa that day as their engaging in a 20-minute conversation, after which she showered and then left.

{¶ 38} On cross-examination, Fidelis denied that he ever touched Theresa's breast that day and denied that he kissed her. The prosecutor then asked Fidelis whether he recalled a telephone conversation he had with his sister from the jail. Fidelis said he could not recall. Outside of the presence of the jury, the state refreshed Fidelis' recollection by playing the audio recording. After playing the recording, the state questioned Fidelis concerning his statements to his sister:

> The prosecutor: And when your sister informed you Theresa was saying that you had raped her and that you had hurt her shoulder, you said I grabbed her breast and that was it?
>
> Fidelis: No. What happened was I was in shock, you know, so what I said on that day, I hearing today [sic], I do not recall that saying because it was so much stress with what was going on. So that was kind of a slip of tongue when I said that. That's not what I meant.

- 9 -

> The prosecutor: Oh, so when you told your sister you did grab her breast but that that was it, that was just a slip of the tongue?
>
> Fidelis: Yeah, because I wasn't, yeah.
>
> The prosecutor: You had no idea at that point in time that your DNA was actually going to be found on her breast.
>
> Fidelis: I'm well-educated. I know about DNA, but the shock that I was in jail for something that didn't happen, and I was telling [her] what was going on, I said that.
>
> The prosecutor: So on Saturday, November 7, when your sister told you that Marie or Theresa was saying that you had raped her and that you broke her shoulder, you told her that you grabbed her breast and that was it, but that was a lie to your sister?[2]
>
> Fidelis: Not exactly. Not exactly, that was a lie. I wasn't going to lie because –
>
> The prosecutor: It was an incorrect statement.
>
> Fidelis: [Indiscernible] yeah, because of the stress that I was. [Sic.]

The prosecutor then asked Fidelis about his statement that "I don't beat women" and asked whether an ex-wife had previously accused him of domestic violence. Fidelis confirmed that the ex-wife had alleged that he cut off her ponytail but he denied assaulting his ex-wife. He stated that both he and his ex-wife called the police, the police arrested both of them, and the case was dismissed.

**D. Verdict and Appeal**

{¶ 39} The jury returned guilty verdicts on Counts One and Four, kidnapping and domestic violence. The jury found Fidelis not guilty of Counts Two and Three, rape and felonious assault. The court entered the verdicts and sentenced Fidelis to a prison term.

---

2. "Marie" was another name used by Theresa.

- 10 -

Fidelis appealed, raising five assignments of error, which we will address out of order.

## II. Law and Analysis

### A. Assignment of Error No. 1:

{¶ 40} APPELLANT, AN AFRICAN AMERICAN, WAS DENIED EQUAL PROTECTION UNDER THE LAW WHEN THE TRIAL COURT STRUCK THE SOLE AFRICAN AMERICAN JUROR[.] *BATSON V. KENTUCKY*, [476 U.S. 79, 106 S.Ct. 1712 (1986)].

{¶ 41} Fidelis contends that the trial court violated his equal protection rights when the state exercised a peremptory challenge to exclude Juror 99, a black juror, and the court overruled his objection brought pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986). The state counters that it provided a non-pretextual, race-neutral explanation for excusing Juror 99 and that Fidelis failed to meet his burden to prove an improper racial motivation.

### 1. Background

{¶ 42} During voir dire, the court asked the venire whether anyone had any scheduling conflicts that could impact their ability to serve. Several jurors responded affirmatively, including Juror 99. Juror 99 explained that she was a licensed funeral director and that serving would be a "hinderance." She went on to explain that she and her father, both funeral directors, operated a family funeral business and were conducting about two funerals a day. She further explained that it was necessary "by law" to have a licensed funeral director both at the funeral home and at the cemetery. Juror 99 stated that it was "possible" she could serve, "if I have to." She had already scheduled one funeral every day that week, and three on Friday.

{¶ 43} Juror 377, Juror 1, Juror 371, and Juror 829 also offered explanations for difficulty serving. Juror 377 discussed having a previously scheduled medical appointment.

Juror 1 stated that her daughter was having surgery the following day and she was providing transportation. Juror 371, a single mother without family around to help, needed to take her daughter to a previously scheduled surgery that week. Likewise, Juror 829 needed to drive her husband to a medical appointment the next day.

{¶ 44} The court then asked if anyone had any physical or other problems that could be a hindrance towards serving. Juror 99 again responded affirmatively. Juror 99 explained that she wore a hearing aid and reads lips "a lot." She explained that she would need to be "close" and that "[i]f I can see the witness stand and see their mouth, that'd be fine." She also indicated she hears male voices more easily than female voices.

{¶ 45} The prosecutor then questioned the venire. The prosecutor asked Juror 99 follow-up questions regarding her ability to hear witnesses. Juror 99 again indicated that if she could see the witnesses' lips, she would be okay and could understand what they were saying. The prosecutor asked whether Juror 99 would feel comfortable raising her hand and letting people know if she had difficultly hearing. Juror 99 confirmed that she could do that.

{¶ 46} The prosecutor then asked whether any jurors felt like they would be too distracted to serve. The prosecutor specifically asked Juror 99 whether concerns with her work schedule would be a distraction and whether she could get her work "covered for the next few days." Juror 99 responded that she would have to ask her father, and reiterated how much work they had, including that they were operating 50 funerals per month. She indicated that if she had to serve on the jury, she would tell her father and that "I'll have to let him know that he has to try to figure it out." She added that "if he has to turn families away or they have to come in after hours or something, that'll be something he has to decide."

{¶ 47} During defense counsel's examination of the venire, he greeted the jurors and

asked, "How's everybody?" The venire responded in unison, "Good." Defense counsel then apparently directed a comment towards Juror 99, stating, "You all right? Let me know if you have a problem hearing me, all right?" Juror 99 responded, "No, you're fine."

{¶ 48} During peremptory challenges, the parties took turns excusing jurors. The state exercised its final peremptory challenge on Juror 99. The defense raised a *Batson* objection.

{¶ 49} The prosecutor then explained the use of the peremptory challenge, stating that Juror 99 had discussed how it would be difficult for her to serve because of her position as a funeral director, and that the family business' loss of customers during her jury service could be a distraction. The prosecutor also observed that when the defense counsel had asked the venire to raise their hands if they were willing to be here and participate on the jury, Juror 99 had been the last person to raise her hand.

{¶ 50} In response, defense counsel stated that Juror 99 had said that she could serve despite the hardship. In addition, defense counsel indicated that Juror 99 was the sole African American prospective juror and that it was very important that they have diversity on the jury.

{¶ 51} The trial court noted Juror 99's comments regarding her difficulty serving on the jury due to her occupation. The court also noted that defense counsel had not argued that the state challenged Juror 99 based on her race, but rather had provided "reasons and justifications as to why she should remain on the jury." The court concluded that defense counsel had not demonstrated that the state's challenge was racially motivated. The court found that the race-neutral reasons proffered by the state for challenging Juror 99 were sufficient and excused Juror 99.

### 2. Analysis of *Batson* Challenge

{¶ 52} The Equal Protection Clause forbids the state's use of peremptory challenges

to exclude potential jurors based solely on their race. *Batson,* 476 U.S. at 89. In *Batson,* the United States Supreme Court set forth a three-prong test for determining whether a prosecutor's use of a peremptory challenge is racially motivated. *State v. Smith*, 12th Dist. Butler No. CA2009-02-038, 2010-Ohio-1721, ¶ 85.

{¶ 53} First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination by showing that the state used a peremptory challenge to exclude a potential juror based on race. *Id.*, citing *Batson* at 96. Second, if the opponent makes a prima facie case, the burden shifts to the state to offer a race-neutral explanation for the peremptory challenge. *Id.*, citing *Batson* at 97. Third, the trial court must determine whether the prosecutor's race-neutral explanation is credible or is instead a pretext for unconstitutional discrimination. *Id.* at ¶ 86, citing *State v. McCuller,* 12th Dist. Butler No. CA2005-07-192, 2007-Ohio-348, ¶ 11.

{¶ 54} The first part of the three-prong *Batson* test asks whether Fidelis has made a prima facie case of racial discrimination by showing the state used a peremptory challenge to exclude Juror 99 based on race. *Batson* at 96. Here, the trial court made no ruling on whether Fidelis made a prima facie showing of racial discrimination. Rather, Fidelis objected to the state's peremptory challenge to Juror 99 and the trial court then indicated that it believed that defense counsel was raising a *Batson* challenge, which defense counsel confirmed. The court then stated it was the state's obligation to demonstrate why the peremptory challenge was not racially motivated. The prosecutor went on to offer race-neutral reasons to remove Juror No. 99 and the trial court overruled the *Batson* challenge based on those reasons. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Smith* at ¶ 85, fn. 5, citing *Hernandez v. New York*, 500 U.S. 352,

359, 111 S.Ct. 1859 (1991); *State v. Hunter,* 2d Dist. Montgomery No. 22201, 2008-Ohio-2887, ¶ 14. We therefore do not need to consider whether Fidelis made a prima facie showing, and we may proceed to the next step.

{¶ 55} The second part of the three-prong *Batson* test asks whether the state offered a race-neutral explanation for the peremptory challenge. *Batson* at 97. As previously stated, the state offered a race-neutral explanation for its peremptory challenge of Juror 99 when it explained its concern about Juror 99's potential to be distracted during jury service due to her position as a funeral director and her family business' loss of customers as well as her general lack of enthusiasm about serving.

{¶ 56} This brings us to the third part of the three-prong *Batson* test: whether the prosecutor's race-neutral explanation is credible or is instead a pretext for unconstitutional discrimination. Because the third stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, a reviewing court gives the findings of the trial court great deference. *Smith*, 2010-Ohio-1721 at ¶ 86*.* "'Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations.'" *Id.* quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029 (2003). A trial court's determination that a defendant has failed to establish purposeful discrimination will not be reversed on appeal unless that determination can be said to be "clearly erroneous." *McCuller*, 2007-Ohio-348 at ¶ 11.

{¶ 57} Upon review, we find that the trial court did not err in concluding that the state's race-neutral explanation was credible, and not pretextual. Juror 99 was one of the few jurors who discussed serving on the jury as being a hindrance or a distraction. Juror 99's comments clearly indicated to the court and parties that serving on the jury would be a hardship on her and her family business. While she stated she could serve, "[i]f I have to," her obvious preference was to be excused. She explained that a result of informing her

father of her jury service would be having to turn away clients from her family funeral home business. Additionally, the state noted that Juror 99 was the last member of the venire to raise her hand when defense counsel polled the jurors about their level of willingness to serve on the jury. Juror 99's lack of enthusiasm in this regard simply underscored her reluctance to serve and the hindrance she believed it would cause her family business.[3]

**{¶ 58}** Fidelis on appeal argues that there was evidence of racial bias because while Juror 377 and Juror 1 (who were not black) both also expressed reasons why serving could conflict with their schedules, the prosecutor spent "no amount of time quizzing these jurors" about their ability to concentrate on the evidence and instead only "extensively questioned" Juror 99.

**{¶ 59}** We do not agree that the prosecutor "extensively questioned" Juror 99. The state's questioning of Juror 99 was brief and limited to those issues relevant to her concerns with serving. Beyond that, there is an obvious reason that the prosecutor may have chosen not to further question Juror 377 and Juror 1 concerning their potential hardships. During the jury selection process, two jurors were excused for cause. Seven were peremptorily excused. Despite this, neither Juror 377 nor Juror 1 made it on to the jury. Thus, the lack of questioning by the prosecutor could simply be the result of both jurors being unlikely to sit on the jury due to their position in the jury pool.

**{¶ 60}** Based on the foregoing, the state presented racially-neutral reasons for excusing Juror 99. On the other hand, Fidelis offered no evidence of any racially-motivated reasons by the state in peremptorily excusing Juror 99; he merely offered reasons why he

---

3. There were other issues that may have concerned the state with Juror 99 being seated on the jury. Juror 99 indicated that she suffered hearing loss and would need to be "close" to witnesses and be able to read their lips. Either the state or the defense could have concerns with a juror who would need to be carefully watching the lips of witnesses throughout the trial to ensure that they heard all the testimony. However, the prosecutor did not specifically mention this issue when she explained the state's reasoning for using a peremptory challenge with regard to Juror 99, so we do not discuss this issue in our analysis above.

thought it would be beneficial for Juror 99 to serve on the jury. The trial court's decision was not "clearly erroneous." *McCuller,* 2007-Ohio-348 at ¶ 11. We overrule Fidelis' first assignment of error.

**B. Assignment of Error No. 2:**

{¶ 61} THE JURY'S FINDING APPELLANT GUILTY OF KIDNAPPING IN VIOLATION OF O.R.C.§2905.01(A)(4) WAS AGAINST THE SUFFICIENCY AND WEIGHT OF THE EVIDENCE.

{¶ 62} Fidelis argues that the state submitted insufficient evidence as a matter of law to convict him of kidnapping. Specifically, Fidelis contends that the state failed to produce evidence of restraint. For the same reasons, he argues that his conviction for kidnapping was against the manifest weight of the evidence.

**1. Standard of Review**

{¶ 63} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Carroll*, 12th Dist. Clermont Nos. CA2007-02-030 and CA2007-03-041, 2007-Ohio-7075, ¶ 117; *State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997). In reviewing the sufficiency of the evidence underlying a criminal conviction, the appellate court examines the evidence to determine whether such evidence, if believed, would support a conviction. *Carroll* at ¶ 117. In reviewing a record for sufficiency, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 64} While the test for sufficiency requires a determination as to whether the state has met its burden of production at trial, a manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *Id.* at ¶ 118, citing *State v. Wilson*, 12th Dist. Warren No.

CA2006-01-007, 2007-Ohio-2298, ¶ 34. In determining whether a conviction is against the manifest weight of the evidence, the appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Carroll*, 2007-Ohio-7075 at ¶ 118. However, while appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide. *Id.*

{¶ 65} Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will be dispositive of the issue of sufficiency. *Carroll* at ¶ 119.

### 2. Analysis of Evidence in Support of Kidnapping

{¶ 66} The court convicted Fidelis of kidnapping in violation of R.C. 2905.01(A)(4). That statute provides, in pertinent part, that "[n]o person, by force, threat, or deception * * * shall * * * restrain the liberty of the other person, for any of the following purposes: * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."

{¶ 67} Fidelis challenges whether the state submitted evidence that he restrained Theresa. He argues that even in Theresa's version of events, when Theresa wanted to get up out of bed, "she simply pushed him off of her and rolled out of bed." In addition, Fidelis notes the evidence that once she was off the bed, Theresa had an unimpeded ability to leave the home but instead chose to take a shower and prepare for work.

{¶ 68} Upon review of the trial record, we find that the state submitted sufficient evidence of restraint. Theresa testified that after she initially said, "get off me," Fidelis "put

his whole bodyweight on top of me."  As she was repeatedly telling him to get off her, he put his right forearm on her neck and "continued to press."  His forearm kept getting "tighter and tighter" on her neck and she could not catch her breath.  She recollected that, "[I]t was getting harder to breathe."  Theresa testified that she was "moving her hips" but that "all of his bodyweight was on me" and

> I couldn't get him off me.  I was like – kept begging him, please, get off of me.  Stop.  Stop.  I don't want this.  I don't want – I'm not – I'm not doing this.  Get off me, please.  You're hurting me. I can't breathe.  I turned my neck all the way to the right because I – because I couldn't breathe.  And I just – I just kept fighting him and begging him.

Eventually, the children were at the door banging and screaming for Fidelis to stop.  Theresa was then able to "push him off."

{¶ 69}  This testimony was sufficient to prove that Fidelis restrained Theresa's liberty. Specifically, Theresa testified that Fidelis put his entire body weight on her, pressed his forearm against her neck to the point where she had trouble breathing, and that despite moving her hips, she was unable to "get him off me."  He continued to restrain her despite her protests.

{¶ 70}  In terms of the sufficiency of the evidence of restraint, Theresa's ability to subsequently get off the bed by herself is of no significance.  This simply could indicate that Fidelis reduced or eliminated the force that he had previously been using to hold her in place, possibly due to the children's pleas.

{¶ 71}  With respect to the manifest weight of the evidence, all the arguments Fidelis presents are challenges to Theresa's credibility.  For instance, he questions why she did not leave the home after the incident and why she would instead take a shower and prepare for work.  These are all issues that were squarely presented to the jury and which the jury could consider in weighing Theresa's credibility.  We defer to the factfinder on matters that

affect witness credibility. *State v. Statzer*, 12th Dist. Butler No. CA2015-08-148, 2016-Ohio-7434, ¶ 25, citing *State v. Andrews,* 12th Dist. Butler No. CA2009-02-052, 2010-Ohio-108, ¶ 46. Here, the jurors accepted Theresa's testimony regarding being restrained by Fidelis notwithstanding these questions about her actions afterward. However, we would note that given the domestic relationship between the accused and accuser, as well as the presence of the parties' minor children, Theresa's response does not appear unusual. Accordingly, we find that the greater weight of the evidence supports the conclusion that Fidelis restrained Theresa, and that the jury did not lose its way when it convicted Fidelis of kidnapping under R.C. 2905.01(A)(4). We overrule Fidelis' second assignment of error.

**C. Assignment of Error No. 3:**

{¶ 72} THE TRIAL COURT ERRED IN NOT GIVING A LIMITING INSTRUCTION TO THE JURY THAT EVIDENCE INTRODUCED BY THE STATE OF PRIOR BAD ACTS BY APPELLANT SHOULD BE CONSIDERED FOR PURPOSES OF CHARACTER ONLY AND NOT FOR THE PURPOSE OF DEMONSTRATING THAT PRIOR ACTS PROVED APPELLANT ACTED IN CONFORMITY THEREWITH.

{¶ 73} Fidelis contends that when the trial court permitted the state to elicit testimony from him concerning his ex-wife's prior accusation that he engaged in domestic violence, any relevance such evidence might have had was outweighed by its prejudicial effect. Therefore, he argues, the court was obligated to mitigate any harm caused by the evidence through a limiting instruction to the jury. He argues the court's failure to give such a limiting instruction was reversible error.

{¶ 74} Fidelis' defense counsel did not request any limiting instruction at trial and did not object to the lack of a limiting instruction. Therefore, our review of this issue is limited to a determination of whether the court committed plain error in failing to instruct the jurors regarding their consideration of the state's cross-examination. *State v. Evick*, 12th Dist.

Clermont No. CA2018-03-016, 2019-Ohio-2791, ¶ 24.

### 1. Plain Error Standard of Review

{¶ 75} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Crim.R. 52(B) places three limitations on a reviewing court's decision to correct an error not raised before the trial court. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). First, an error, "i.e., a deviation from a legal rule," must have occurred. *Id.*, citing *State v. Hill*, 92 Ohio St.3d 191, 200 (2001), in turn citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770 (1993). Second, the error complained of must be plain, i.e., it must be "an 'obvious' defect in the * * * proceedings." *Id.*, quoting *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001), in turn citing *State v. Keith*, 79 Ohio St.3d 514, 518 (1997). Third, the error must have affected "substantial rights," that is, the error must have affected the outcome of the trial. *Id.* An appellate court will take notice of plain error with "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12.

### 2. Analysis of Claim for Limiting Instruction

{¶ 76} During direct examination defense counsel asked Fidelis if he caused Theresa physical injury. Fidelis responded with an elaboration, stating that he and Theresa had been together almost 11 years and that, "I don't beat women. I don't push. I don't – I'm cautious of these signs. I know the consequences."

{¶ 77} Prior to the state's cross-examination of Fidelis, the prosecutor asked for a sidebar and asked the court for a ruling on whether she could question Fidelis about a prior allegation of domestic violence based on the theory that Fidelis' statement that, "I don't beat women" had opened the door to such questions. Referring to our prior case law, the trial court determined that the state could cross-examine concerning prior allegations but would

not be permitted to introduce extrinsic evidence if Fidelis denied the allegations.

**{¶ 78}** During cross-examination, the prosecutor questioned Fidelis concerning his statement that "I don't beat women" and asked whether an ex-spouse had accused him of domestic violence. He acknowledged the accusation and stated that the ex-spouse had accused him of cutting her ponytail. He did not recall whether the ex-spouse had accused him of holding her down. Fidelis characterized the prior incident as, "I called the police. She called the police too. We both were arrested, and at the end of the day, the case was dismissed." The state moved on without attempting to introduce extrinsic evidence of the alleged offense and without attempting to rebut Fidelis' denials of the allegations.

**{¶ 79}** In *State v. Eldridge*, 12th Dist. Brown No. CA2002-10-021, 2003-Ohio-7002, we held that the prosecution may not initiate questioning to establish a criminal defendant's propensity for violence in a trial for a violent offense. *Id.* at ¶ 41, citing Evid.R. 404(A). But we noted that a defendant is permitted to introduce testimony of a relevant character trait that would tend to prove he acted in conformity with that trait on a particular occasion. *Id.* citing Evid.R. 404(A)(1).

**{¶ 80}** If, however, the defendant introduces such evidence, it "opens the door" for the prosecution to rebut or impeach this character evidence on cross-examination. *Id.* at ¶ 42, citing Evid.R. 405(A). Such cross-examination may include inquiry into specific instances of conduct, including relevant prior criminal convictions. *Id.* at ¶ 42-43.

**{¶ 81}** Pursuant to *Eldridge*, we conclude that the trial court correctly permitted the state to attempt to rebut Fidelis' statement during his direct testimony that he does not "beat women" with inquiry into a specific instance of conduct. While Fidelis did not deny the accusation, he denied any improper behavior on his part.

**{¶ 82}** Upon review and consideration, we do not find plain error based on the trial court's failure to inform jurors that they could only consider the state's questioning for the

limited purpose of rebutting Fidelis' testimony concerning his character.

{¶ 83} Initially, we find no "obvious" defect or deviation from a legal rule. Our case law established that by offering character evidence, Fidelis opened the door to the state's questioning. Fidelis cites no authority for the proposition that once a defendant opens the door to such questioning, the law imposes a legal duty upon a trial court to provide a limiting instruction to jurors. Moreover, there was an obvious reason that the court may not have chosen to offer such an instruction in the absence of a request from the defense. Defense counsel may not have wanted to highlight this questioning by directing the jury's attention to it through a limiting instruction.

{¶ 84} And even if we assumed that the court erred by failing to provide a limiting instruction, we would still not be able to say that the outcome of the trial would have been different given the facts of this case. Fidelis denied Theresa's version of events entirely. He claimed that the only physical contact he had with Theresa was touching her thigh. However, Theresa's testimony controverted Fidelis' testimony. Additionally, Fidelis' statements to his sister the day after the incident (stating he only "grabbed her breast and that was it") and the DNA evidence recovered from Theresa's nipple swab further undercut his "no-offense-occurred" version of events. And Theresa produced multiple witnesses who corroborated her claims insofar as the information she provided to them shortly following the incident was consistent with her trial testimony.

{¶ 85} Given that the jury accepted Theresa's claims that Fidelis restrained and physically harmed her and rejected Fidelis' inconsistent version of events on those matters, we do not think that the prosecutor's line of questioning regarding his ex-wife's accusation and Fidelis' response had any impact on the outcome. Thus, we do not find that the court violated Fidelis' substantial rights.

{¶ 86} Finally, we note that Fidelis extensively cites *State v. Hartman*, 161 Ohio St.3d

214, 2020-Ohio-4440, in support of his argument that the court here should have considered a limiting instruction. In *Hartman*, the Ohio Supreme Court examined Evid.R. 404(B) and the types of evidence admissible and not admissible under that rule of procedure. *Hartman* dealt with direct testimony during the state's case in chief concerning other criminal acts committed by the defendant. *Id.* at ¶ 12. Here, however, Evid.R. 405(A)(1) expressly permitted the prosecutor's questions after Fidelis opened the door. We find *Hartman* distinguishable from the case at hand. We overrule Fidelis' third assignment of error.

### D. Assignment of Error No. 5:

{¶ 87} APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 88} Fidelis contends that his trial counsel provided constitutionally defective performance by failing to request a jury instruction on the (C)(1) subsection of the kidnapping statute, and on the offenses of abduction and unlawful restraint.

### 1. Standard of Review

{¶ 89} To prevail on an ineffective assistance of counsel claim, Fidelis must show his defense counsel's performance was deficient, and that he was prejudiced as a result. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 49; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Defense counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Fidelis must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694. The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *Clarke* at ¶ 49. We strongly presume that defense counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019,

2014-Ohio-4625, ¶ 7. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence * * *." *Strickland* at 689.

### 2. Analysis of Alleged Failure to Request Instructions

{¶ 90} R.C. 2905.01(C)(1) concerns the "safe-place-unharmed" instruction. That section provides in relevant part,

> kidnapping is a felony of the first degree * * * if an offender who violates division (A)(1) to (5) * * * releases the victim in a safe place unharmed, kidnapping is a felony of the second degree.

{¶ 91} Fidelis argues that the facts of the case merited a safe-place-unharmed instruction and the failure to request it constituted ineffective assistance of counsel. With respect to harm, he points to his testimony that he merely touched Theresa's thigh and notes that the photograph of Theresa's shoulder depicted no visible injuries. Accordingly, Fidelis contends the jury could have found from the evidence that he released Theresa in a safe place unharmed, which would have resulted in a conviction for a second-degree felony rather than a first-degree felony.

{¶ 92} However, the Ohio Supreme Court had held that an attorney who does not request a safe-place-unharmed instruction provides effective assistance where a safe-place-unharmed instruction could undermine a reasonable, "no-offense-occurred" trial strategy. *State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, ¶ 28. In *Mohamed*, the state charged Mohamed, a cab driver, with kidnapping and sexual offenses after the woman Mohamed was transporting in his taxicab accused him of failing to stop the taxicab when she asked him to stop and then sexually assaulting her inside the taxicab. *Id.* at ¶ 6, 9. Once the taxicab arrived at the woman's intended destination, she immediately left the taxicab and sought help. *Id.* at ¶ 7.

{¶ 93} Mohamad's counsel's strategy at trial was that the woman's accusations were "one big lie." *Id.* at ¶ 8. Accordingly, throughout trial, defense counsel attempted to

undermine the woman's credibility. *Id.* Defense counsel did not request a safe-place-unharmed instruction under R.C. 2905.01(C)(1). The jury convicted the defendant of first-degree felony kidnapping. *Id.* at ¶ 9, 10.

{¶ 94} The Ohio Supreme Court examined whether Mohamed had demonstrated that his counsel provided defective performance by failing to request the safe-place-unharmed instruction under R.C. 2905.01(C)(1). The court observed that a defendant must overcome a "strong presumption" that counsel's decisions are part of a sound trial strategy and that even "tactical error" and "questionable" trial strategies do not rise to the level of ineffective assistance. *Id.* at ¶ 18-19. Simply because there was "another and better strategy available" also did not constitute defective assistance. *Id.* at ¶ 19, citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

{¶ 95} Applying this legal standard, the supreme court found that defense counsel had a simple trial strategy: "completely deny that any kidnapping or sexual assault occurred * * *." *Id.* at ¶ 20. Counsel reinforced this strategy in closing, attacking the alleged victim's credibility and calling her story "preposterous." *Id.* at ¶ 21. The Ohio Supreme Court found that given the chosen trial strategy, which it found reasonable, Mohamad's failure to request a safe-place-unharmed instruction did not constitute defective performance. *Id.* at ¶ 22. The court explained that counsel would have lost credibility with the jury by arguing that if his client did kidnap the woman, he left her in a safe place unharmed. *Id.*

{¶ 96} Here too, Fidelis' defense theory was simple. Theresa's claims were all "one big lie." He denied all accusations of any physical or sexual assault, and only claimed to have briefly tapped her thigh.

{¶ 97} This was a case where there were no eyewitnesses to what occurred other than the alleged victim and the alleged perpetrator. Under such circumstances, the case rested on the credibility of the witnesses and the corroborating evidence. Given Fidelis'

testimony on the stand, defense counsel had little choice but to work with the "one big lie" defense theory.

{¶ 98} Based upon the Ohio Supreme Court's precedent in *Mohamed*, we find that a "safe-place-unharmed" argument by defense counsel could have undermined Fidelis' credibility with the jurors. Accordingly, we find that Fidelis has not overcome the strong presumption that his counsel's trial strategy was sound. *Mohamed* at ¶ 18.

### 3. Failure to Request Instruction on Abduction and Unlawful Restraint

{¶ 99} Fidelis next argues that his defense counsel provided constitutionally defective performance by failing to request that the court instruct the jury on the lesser-included offenses of abduction and unlawful restraint.

{¶ 100} The jury convicted Fidelis of kidnapping under R.C. 2905.01(A)(4), which provides that, "No person, by force, threat, or deception * * * shall * * * restrain the liberty of the other person, for any of the following purposes: * * * To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will * * *." Abduction, in violation of R.C. 2905.02(A)(2), provides that "No person, without privilege to do so, shall * * * By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear * * *." Unlawful restraint, in violation of R.C. 2905.03(A), provides that "No person, without privilege to do so, shall knowingly restrain another of the other person's liberty."

{¶ 101} The law only requires a trial court to provide an instruction on a lesser-included offense where the evidence presented at trial would reasonably support both an acquittal on the charged offense and a conviction on the lesser included offense. *State v. Tolle*, 12th Dist. Clermont No. CA2014-06-042, 2015-Ohio-1414, ¶ 11. In his appellate brief, Fidelis does not clearly articulate how the evidence presented at trial would have led to both an acquittal on kidnapping and a conviction of either of the two lesser offenses. He

briefly states that deception is a potential element under kidnapping and there was "no factual evidence that Appellant restrained his wife by deception." Fidelis' argument appears to suggest that because deception was not a means by which he was accused of restraining Theresa's liberty, then the trial court could not have convicted him of kidnapping. But as the statute provides, deception is only one potential means of demonstrating the offense. R.C. 2905.01(A). The statute also contemplates a defendant restraining a victim's liberty by "force" or "threat." *Id.* There was, of course, evidence submitted that Fidelis restrained Theresa by force. Therefore, the lack of any evidence of deception would not necessarily have supported an acquittal on the kidnapping charge. As Fidelis fails to clearly articulate his lesser-included offense argument beyond the deception issue, we decline to craft an argument for him. App.R. 16(A)(7) (requiring an appellant's brief to contain "the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions* * *"). As such, we find that, the decision not to request an instruction on abduction or unlawful restraint could not have constituted deficient performance.

{¶ 102} We overrule Fidelis' fifth assignment of error.

**E. Assignment of Error No. 4:**

{¶ 103} THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE INFERIOR DEGREE OF THE INDICTED OFFENSE CONSISTENT WITH O.R.C. §2905.01(C).

{¶ 104} Fidelis argues that the court erred in failing to instruct jurors on the safe-placed-unharmed provisions of R.C. 2905.01(C)(1). As set forth previously, Fidelis did not request an instruction under R.C. 2905.01(C)(1) and did not otherwise object to the jury instructions provided by the court. As such, he must demonstrate plain error. *Evick*, 2019-Ohio-2791 at ¶ 24. Fidelis does not argue plain error in his appellate brief. And it is not our

duty to construct a plain error argument on his behalf. *State v. Schneider*, 4th Dist. Athens No. 19CA1, 2021-Ohio-653, ¶ 47 (noting that the appellant did not suggest a plain error analysis and that it is not the appellate court's duty to construct an argument not presented), citing *State v. Steers*, 4th Dist. Washington No. 11CA33, 2013-Ohio-3266, ¶ 20. *Accord State v. Brown*, 9th Dist. Lorain Nos. 20CA011646, 20CA011649, 2021-Ohio-2161, ¶ 15 (declining to construct a plain-error argument on the appellant's behalf). For this reason alone, Fidelis' fourth assignment of error lacks merit and should be overruled.

{¶ 105} In any event, no plain error occurred here. Based upon our analysis of the fifth assignment of error, we do not find that Fidelis has identified any error, much less plain error, in the failure of the trial court to instruct the jurors on the safe-place-unharmed provision of R.C. 2905.01(C)(1). As we described above, Fidelis' defense was premised upon the "one big lie" theory of the case. A "safe-place-unharmed" argument by defense counsel could have undermined Fidelis' credibility with the jurors. Moreover, in *Mohamed*, the Ohio Supreme Court explained that,

> Having determined that counsel's decision not to request an instruction on the safe-place-unharmed defense falls within a reasonable trial strategy, we will not find that the trial judge committed plain error in failing to provide the unrequested instruction.

*Id.* at ¶ 28. Fidelis has failed to show that the trial court's alleged failure to give the jury the instruction was obvious error, that it deviated from clear legal rules, or that it affected the outcome of the trial.

{¶ 106} We overrule Fidelis' fourth assignment of error.

### III. Conclusion

{¶ 107} For the foregoing reasons, we find that Fidelis has not established that the state violated his equal protection rights in its use of its peremptory challenges. The state demonstrated Fidelis' kidnapping conviction was supported by sufficient evidence and the

greater weight of the evidence. The court did not plainly err in failing to provide a limiting instruction concerning the state's character rebuttal evidence. Counsel was not ineffective for failing to request a safe-place-unharmed kidnapping instruction. The court did not plainly err in failing to instruct the jurors on the same instruction.

**{¶ 108}** Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.