[Cite as *State v. Ballein*, 2022-Ohio-2331.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

|                     |     |                          |
|---------------------|-----|--------------------------|
| STATE OF OHIO,      | :   |                          |
| Appellee,           | :   | CASE NO. CA2021-10-022   |
|                     | :   | O P I N I O N            |
| - vs -              |     | 7/5/2022                 |
|                     | :   |                          |
| DYLAN M. BALLEIN,   | :   |                          |
| Appellant.          | :   |                          |

CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. CRI 20210074

Jess C. Weade, Fayette County Prosecuting Attorney, and Aubrie Allen, Assistant Prosecuting Attorney, for appellee.

Steven H. Eckstein, for appellant.

**HENDRICKSON, J.**

{¶1}   Appellant, Dylan Ballein, appeals from his conviction in the Fayette County Court of Common Pleas after a jury found him guilty of felonious assault with a firearm specification and attempted murder with a firearm specification.  For the reasons detailed below, we affirm appellant's conviction.

{¶2}   In April 2021, appellant was indicted after shooting his girlfriend's ex-boyfriend

on March 14, 2021. That day, appellant was visiting his girlfriend, Amber, at her home on North North Street in Washington Court House. At approximately 11 a.m., Amber's ex-boyfriend ("the victim") approached the backdoor of the home from the alleyway. A verbal altercation ensued between the victim and appellant, which resulted in appellant shooting the victim through the wooden backdoor a total of four times. The victim fled from the home on his bicycle and collapsed in a neighbor's yard nearby. Two neighbors, who were familiar with the victim, rushed to render aid and notified the police. After the authorities arrived, the victim was transferred to a hospital in Columbus, where he was placed on life support and received multiple surgeries. Despite suffering significant injuries to his torso, leg, hand, and wrist, the victim survived the shooting and was released from the hospital several weeks later.

{¶3} While officers processed the scene, Washington Court House Detective John Warnecke interviewed appellant at the police station. A videorecording of the interview was played during the state's direct examination of Detective Warnecke and was admitted into evidence. During the interview, appellant informed the detective that Amber had a protection order against the victim and he was not permitted to be at her house. The night before the incident, someone broke Amber's bedroom window and slashed the air valve of appellant's tire. Believing that the victim was the perpetrator, Amber called the police. The following day appellant was fixing Amber's bedroom window when Amber stated her dog was barking. At that point, appellant walked towards the kitchen and saw a hooded man, the victim, running towards Amber's backdoor. Upon reaching the door, the victim began shouldering the door, attempting to break it down, while threatening to kill Amber and appellant. As he approached the door, appellant removed a firearm from his pocket and shot the victim in the chest and the back. Appellant believed the victim was using illegal drugs at the time and that he was going to break into the house and hurt appellant and

Amber.

{¶4} After appellant's initial interview with Detective Warnecke, an investigation ensued. As part of the investigation, officers retrieved security camera footage from the area surrounding Amber's home. Three of those videos were played during the state's case in chief and were admitted into evidence. One of the videos from security camera footage obtained from Amber's next-door neighbor shows part of the incident. On the video, the victim can be seen riding his bicycle in the alleyway behind Amber's house. The victim waits near Amber's car for close to two minutes before approaching her house. While he is waiting in the alleyway, sounds of birds chirping and a dog barking can be heard on the recording. Due to the placement of the security camera, the video does not show Amber's backdoor, nor does it show the victim reach her porch area. However, after walking towards the rear of Amber's house and going out of the camera's view, the victim can be heard stating either, "You are a dumb bitch" or "You are done bitch." At that point, someone responds to the victim before four gunshots are fired. As the gunshots are heard, the victim reenters the camera's frame, and can be seen fleeing toward his bicycle in the alleyway while yelling, "You shot me." The victim then gets on his bicycle and leaves the premises.

{¶5} Ten days after his initial interview, appellant participated in a second interview with Detective Warnecke, which was also played during his direct examination and admitted into evidence. During the second interview, appellant recounted his version of events. According to appellant, he was fixing Amber's window when she yelled that the dog was barking. As appellant walked towards the kitchen, he observed a man running towards the backdoor with his hood on and his hands in his pockets. Appellant asked Amber, "Who's that?" to which Amber responded, "Oh my god, that's him!" while she ran and locked the door. The victim proceeded to shoulder the door two or three times while stating, "Wait until I get in there, I'm going to kill both of you." During the interview, appellant described the

door shouldering as loud enough to be concerning and demonstrated the victim's shouldering for the detective. While the victim was shouldering the door, appellant pulled out his firearm, which he had in his pocket from checking deer sheds the day before, and shot the victim four times.

{¶6} After appellant described the events leading up to the shooting, the detective informed appellant that his story did not match the audio and video recordings of the incident. The detective explained that, based upon a video recording provided by Amber's next-door neighbor, the detective knew the victim did not shoulder the backdoor or attempt to force his way into Amber's house. Appellant initially denied that he was lying about the victim shouldering the door, but later stated that, maybe he did not see the victim attempting to force his way through the door, and that he shot the victim because he was scared. Appellant also initially denied speaking to the victim during the encounter, but later admitted, after hearing the audio recording, that he may have said he was going to shoot the victim prior to firing.

{¶7} After his second interview, appellant was arrested and charged with attempted murder, felonious assault, and two firearm specifications. In August 2021, the matter proceeded to a jury trial. At trial, the state presented testimony from the victim, the two neighbors who rendered aid to the victim, and several Washington Court House personnel, namely Sergeants Adam Phillips and Eric Hott, Officers Charles Hughes and Mathew Ellis, and Detective Warnecke.

{¶8} The testimony at trial revealed that the victim and Amber dated for 16 years before ending their relationship. The couple purchased the home on North Street together more than a year prior to the incident, but the victim had since moved out. The victim and Amber had two children, both of whom lived with Amber in the home. When their relationship ended, Amber and the victim had "problems," which resulted in the victim being

incarcerated for a domestic violence conviction and the imposition of a no contact order. Amber also obtained a domestic violence civil protection order, which prohibited the victim from having contact with Amber or being near her home. It was undisputed at trial that the protection order was in place and effective on March 14, 2021, the day of the incident.

{¶9} On that day, the victim planned to go to the park with his children and intended to meet his children in the alleyway behind Amber's house beforehand. Upon his arrival, the children did not come to the alleyway as discussed. The victim explained at trial that he does not remember anything from that day, except that he was going to see his children. Upon waking up in the hospital, he learned he had been shot four times. In addition to the extensive medical records admitted at trial, the victim described and showed his injuries to the jury. This included one wound centimeters from his heart, one near his liver, one in his leg, one in his wrist, and another in his hand.

{¶10} Officer Hughes testified that on March 14, 2021, he was dispatched to the area of the home in response to an allegation that the victim had violated a protection order. While the officer was responding to the initial dispatch, he received another call relating to gunshots in the area. As he received the second call, Officer Hughes discovered the victim lying next to a tree in someone's yard. When the officer arrived on the scene, two individuals were rendering aid to the victim. The life squad arrived shortly thereafter and transported the victim to the emergency room.

{¶11} While Officer Hughes responded to the victim, Sergeant Hott went to the home to speak with Amber. Upon arriving at the house, appellant was in the backyard. At that point, Sergeant Hott received a second call concerning gunshots in the area. Based upon his observation of shattered glass by the home's backdoor and sidewalk, Sergeant Hott asked appellant if he heard any gunshots. Appellant responded, "Yes, I shot him." The sergeant then secured the firearm, which appellant had left on the kitchen counter, and

placed appellant in his police cruiser.

**{¶12}** After the scene was secured, detectives began their investigation into the case. Detective Warnecke testified that, after reviewing the security camera footage supplied by Amber's neighbors, there were inconsistencies between appellant's initial statement and the video recordings. The detective summarized those inconsistencies as follows:

> So as I started investigating the case, I retrieved the video from the neighbor's house that had clear audio and an additional video that came from the 300 block of Gregg Street, which is about halfway up from where this happened, in that city block. And both of those videos lined up with the audio that we could hear, that there was an exchange between the two, who I believe to be at the time [the victim] and [appellant], and it occurred to me that at no point * * * in the video could you hear anything that sounded like forced entry into the home.
>
> As we watched it multiple times, we were able to hear literally everything that was described prior to that other than any type of knocks or thumps or loud noises that would indicate that there was any type of forced entry into the home.

**{¶13}** The detective clarified that the audio from the recordings did not support appellant's statement that any type of forced entry was attempted by the victim. Specifically, according to Detective Warnecke, appellant's demonstration of the victim's alleged shouldering of the door during the interview conflicted with the audio from the video. He further testified that he did not observe anything on the door of the home that supported an attempted forced entry into the home.

**{¶14}** The detective noted additional inconsistencies, including that the video did not pick up any statement by the victim that he was going to kill appellant or Amber. Nor did it appear to the detective, based upon the distance and the time it took to hear the gunshots, that the victim approached the residence in a quick manner or in a way that would indicate that there was any type of attempted forced entry once he got to the backdoor.

{¶15} On cross-examination, Detective Warnecke acknowledged that the video footage did not show what happened between appellant, Amber, and the victim when the victim went out of the camera's view and approached the door. He further testified that, while he believed at least one shot went through both the storm door and the main door, he was unsure whether the storm door was open during the interaction between appellant and the victim. Thus, although the detective described the storm door as "destroyed," he could not say who destroyed it.

{¶16} Appellant testified in his own defense and reiterated that he was acting in self-defense when he shot the victim. According to appellant, he arrived at Amber's home the night before the incident. That evening, Amber asked appellant to stay at her home because "she was worried [the victim] would arrive at her house trying to assault her." After the couple went to bed, they heard loud banging on her bedroom window as if someone was trying to enter the house. The couple called the police, who responded to the home, and appellant noticed someone had gone through his vehicle and the tire's valve stem had been cut. The next morning, appellant was "very worried that [the victim] would come back and try to threaten, * * * kill, who knows." Appellant acknowledged on cross-examination that he did not see who damaged his tire or knocked on Amber's window.

{¶17} Appellant further testified that he brought his firearm with him to Amber's that evening because he was worried the victim would "follow through with his threats." Regarding the threats, appellant stated that at some point while the victim was in jail, the victim called and asked Amber "if she remembered what happened to her last boyfriend when he put a claw hammer in his head." The victim further stated that "when he got out of jail he was going to be back, come back around and make sure * * * his son knew that his dad was going to come back and * * * get Amber * * * back." Appellant acknowledged on cross-examination that he did not tell Detective Warnecke that he brought his gun to

Amber's to protect himself from the victim.

{¶18} During his testimony, appellant offered a third version of the events that transpired that day. According to appellant, he observed the victim running towards the backdoor as appellant approached the kitchen. At that point, Amber stated "oh my god, that's him." Appellant then pulled his firearm out and said, "Get out of here, I'm going to shoot," and the victim responded with "something kind of sounded like 'you are done' as he flung the storm door open and threw himself against the door." Although appellant previously told the detective that the victim threatened to kill him and Amber, he did not "really recall" that "too well" at the time of trial, but to him, it sounded like the victim was making threats.

{¶19} At the time of trial, appellant was unsure where he shot the victim, but was certain the first shot hit the victim's shoulder as he was shouldering the door. He denied shooting the victim in the back, despite his statement in both interviews that he had done so. According to appellant, the incident was blurry during the first interview, as he was "very tore up" from the incident. When asked why he stated in his second interview that the victim did not shoulder or throw himself against the door, appellant stated: "There was forcing of the door. I changed the narrative for some reason, I'm not sure why." When asked why he did not use force in some other manner than the firearm, appellant responded that lesser force "was kind of not the best plan in my mind for defending myself. It's not really like the wild west or anything. I don't really have to fight that guy hand-to-hand combat."

{¶20} Appellant testified that the first gunshot did not deter the victim and he continued attempting to break into the house. Appellant reiterated that although he did not want to kill the victim, he wanted the victim to leave the property. Appellant did not recall the gunshot near the victim's heart, and claimed that "shooting in the leg and the arm isn't really a death blow to somebody[.]"

{¶21} After considering the above testimony, the jury found appellant guilty on all charges and specifications of the indictment. The trial court merged the charges for sentencing purposes, and, on election by the state, proceeded with the attempted murder charge at sentencing. The trial court then sentenced appellant to an aggregate prison term of 13 to 18 years in prison.

{¶22} Appellant now appeals, raising two assignments of error for our review.

{¶23} Assignment of Error No. 1:

{¶24} THE TRIAL COURT ERRED IN DENYING THE DEFENDANT-APPELLANT'S CRIM.R. 29 MOTION AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO FIND THE SELF-DEFENSE CLAIM INVALID BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶25} In his first assignment of error, appellant argues the trial court erred in denying his Crim.R. 29 motion as the state failed to prove beyond a reasonable doubt that he did not act in self-defense. After a review, we find no merit to appellant's claim.

{¶26} Pursuant to Crim.R. 29(A), a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." The standard of review for a denial of a Crim.R. 29(A) motion for acquittal is the same as the standard of review for a sufficiency of the evidence claim. *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 37. Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines

the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33.

**{¶27}** At the close of the state's case in chief, appellant moved the trial court for acquittal pursuant to Crim.R. 29. The trial court denied the motion, stating the following: "I had sufficient evidence on each and every essential element of the offense where a reasonable trier of fact would come to a reasonable conclusion. I do also find that at this stage of the State's case, that there's been evidence presented that tends to support that the Defendant shot [the victim] in self-defense and/or defense of Amber[.] So the burden is now placed solely on the State of Ohio to prove beyond a reasonable doubt that [appellant] did not use the force in self-defense or in defense of Amber[.]" After resting its case, the defense renewed its Crim.R. 29 motion, which the trial court denied.

**{¶28}** The jury found appellant guilty of felonious assault in violation of R.C. 2903.11(A)(2). Pursuant to that statute, no person shall knowingly "[c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." The jury also found appellant guilty of attempted murder in violation of R.C. 2923.02(A) and 2903.02(A) and (D). R.C. 2923.02(A) provides, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or

result in the offense." R.C. 2903.02(A) provides, "No person shall purposely cause the death of another[.]"

{¶29} On appeal, appellant does not claim there was insufficient evidence to support each and every element of felonious assault, attempted murder, or the accompanying firearm specifications. Rather, appellant argues the trial court erred in denying his Crim.R. 29 motion because the state failed to prove appellant did not act in self-defense.

{¶30} "Traditionally, self-defense has been an affirmative defense which an accused must prove by a preponderance of the evidence." *State v. Fritts*, 12th Dist. Butler No. CA2019-10-173, 2020-Ohio-3692, ¶ 18. However, effective March 28, 2019, the General Assembly modified Ohio's self-defense statute, R.C. 2901.05, to place the burden on the state to prove beyond a reasonable doubt that the accused did not act in self-defense. *State v. Byrd*, 12th Dist. Warren No. CA2019-07-073, 2020-Ohio-3073, ¶ 22.

{¶31} Evidence as to all elements of self-defense must be presented at trial in order for a defendant to be acquitted, but to overcome the claim, the state need only disprove one element of the defense by proof beyond a reasonable doubt. *See State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. Moreover, any presumption as to the use of force in self-defense "may be rebutted by a preponderance of the evidence, provided that the prosecution's burden of proof remains proof beyond a reasonable doubt as described in" R.C. 2901.05(B)(1). R.C. 2901.05(B)(4).

{¶32} This court has routinely held that, because self-defense is an affirmative defense, it is not considered in a sufficiency of the evidence analysis. *State v. Debord*, 12th Dist. Clinton No. CA2019-03-003, 2020-Ohio-57, ¶ 36; *State v. Inabnitt*, 12th Dist. Warren No. CA2021-02-013, 2022-Ohio-53, ¶ 45; *State v. Green*, 12th Dist. Warren No. CA2017-11-161, 2018-Ohio-3991, ¶ 28 (decided prior to the amendment of R.C. 2901.05). This is because "[a]n affirmative defense does not negate the legal adequacy of the state's proof

for purposes of submitting it to the jury." *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, ¶ 15 (4th Dist.); *Green* at ¶ 28. Rather, "an affirmative defense involves an excuse or justification for doing an otherwise illegal act. * * * It does not deny the existence of the act; it simply provides a legal justification for it." *Id.* Thus, once the state has submitted sufficient evidence to allow a factfinder to convict, then the question of the relative persuasiveness of the defendant's affirmative defense is a factfinding determination that is reviewed by an appellate court on a manifest weight of the evidence standard. *State v. Saturday*, 12th Dist. Butler No. CA2018-06-122, 2019-Ohio-193, ¶ 10.

**{¶33}** Notwithstanding the above, appellant essentially argues on appeal that the recent amendment to R.C. 2901.05 imposes a burden of production upon the state in cases where the affirmative defense of self-defense is asserted. Therefore, appellant claims the trial court should have granted his Crim.R. 29 motion on the basis that the state failed to present sufficient evidence to disprove self-defense.

**{¶34}** The Tenth District recently considered the various burdens under the current version of R.C. 2901.05 and discussed how those burdens relate to the state's introduction of sufficient evidence to support a conviction. *State v. Messenger*, 10th Dist. Franklin No. 19AP-879, 2021-Ohio-2044, ¶ 37-44. There, the court held:

> Under the current version of R.C. 2901.05, while the burden of *proof* for the affirmative defense of self-defense has shifted to the state, the burden of *production* for all affirmative defenses, including self-defense, remains with the defendant. * * *Thus, if the state does not bear the burden of production on self-defense, it follows that sufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense.

(Emphasis sic.) *Id.* at ¶ 44. The court further noted that "there is nothing in the current version of R.C. 2901.05(B)(1) indicating that by shifting the burden of proof on the affirmative defense of self-defense, the General Assembly intended to transform the

absence of self-defense into an essential element of a criminal offense." *Id.* at ¶ 43.

{¶**35**} Based upon the Tenth District's analysis in *Messenger*, other Ohio courts have held that, despite the recent change in self-defense law, a challenge to the sufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense. *See State v. Walker*, 6th Dist. Lucas No. L-20-1047, 2021-Ohio-3860, ¶ 61-62; *State v. Claytor*, 8th Dist. Cuyahoga No. 110837, 2022-Ohio-1938, ¶ 67.

{¶**36**} When considering the above, we find the trial court did not err in overruling appellant's Crim.R. 29 motion. Specifically, despite the shift in the burden of proof by the amendment to R.C. 2901.05, the absence of self-defense is not an essential element of any offense that the state carried the burden of proving at trial. Instead, once appellant presented evidence tending to support self-defense, i.e., satisfied his burden of production, the burden of persuasion shifted to the state to disprove at least one of the elements of self-defense beyond a reasonable doubt. Thus, regardless of the state's burden to disprove one of the elements of self-defense, the absence of self-defense is not required to sustain a conviction for attempted murder, felonious assault, or the accompanying firearm specifications. Consequently, appellant's claim of self-defense is not an aspect of a sufficiency of the evidence or Crim.R. 29 analysis, and the trial court did not err in overruling appellant's Crim.R. 29 motion due to appellant's self-defense claim.

{¶**37**} Appellant's first assignment of error is overruled.

{¶**38**} Assignment of Error No. 2:

{¶**39**} THE TRIAL COURT ERRED WHEN IT ENTERED A JUDGMENT AGAINST APPELLANT, WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶**40**} In his second assignment of error, appellant argues the jury's guilty verdict is against the manifest weight of the evidence because he acted in self-defense. He again does not argue that the state failed to produce credible evidence on all the essential

elements of attempted murder, felonious assault, or the accompanying firearm specifications.  Rather, he asserts that the state failed to rebut the presumption, and disprove his claim, that he shot the victim in self-defense.

{¶41}  A manifest weight challenge questions whether the state has met its burden of persuasion.  *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997).  That is, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other."  *State v. Clemmons*, 12th Dist. Butler No. CA2020-01-004, 2020-Ohio-5394, ¶ 15.  To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Id.*

{¶42} Questions regarding witness credibility and weight of the evidence are primarily matters for the trier of fact to decide because the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence. *Id.* at ¶ 16. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*; *Thompkins* at 387.

{¶43}  As noted above, self-defense is an affirmative defense that, if proved, relieves a defendant of criminal liability for the force that the defendant used.  *State v. Kozlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814, ¶ 22 (8th Dist.).  An accused is justified in the use of force against another if (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of

such force; and (3) the accused did not violate any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus; *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). A person has no duty to retreat before using force in self-defense if that person is in a place in which the person lawfully has a right to be. R.C. 2901.09(B).

**{¶44}** A person, like appellant in this case, is presumed to have acted in self-defense "when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering * * * the residence * * * occupied by the person using the defensive force." R.C. 2901.05(B)(2). The term "residence" includes a dwelling in which a person is visiting as a guest. R.C. 2901.05(D)(3).

**{¶45}** In the case sub judice, the evidence reveals that appellant did not have a bona fide belief that he faced imminent danger of death or great bodily harm from the victim. This element of self-defense, "the second element," is a combined subjective and objective test. *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). "[T]he jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack [he] *reasonably* believed [he] was in imminent danger." (Emphasis sic.) *Id.* "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that [he] was in imminent danger." (Emphasis sic.) *Id.* at 331. "Another component contained within the second element is the defendant's bona fide belief that the use of force was the only means of escape. Part of this entails showing that the defendant used 'only that force that is reasonably necessary to repel the attack.'" *State v. Ray*, 12th Dist. Butler No. CA2012-10-213, 2013-Ohio-3671, ¶ 30, quoting *State v. Bundy*, 4th Dist. Pike No. 11CA818, 2012-Ohio-3934, ¶ 55.

**{¶46}** Appellant testified at trial that he shot the victim because he was afraid the victim was going to break down the door and hurt appellant or Amber. This fear was based primarily upon appellant's claim that the victim ran toward the door and attempted to force entry into the home. Despite appellant's testimony, the state presented evidence that contradicted appellant's description of attempted forced entry into the home. Additionally, the jury viewed appellant's interviews with the detective, wherein he altered his version of events from one interview to the next, recanted his allegation that the victim was shouldering the door and attempting to break in, and denied bringing the firearm to Amber's home for protection from the victim. Thus, if the jury believed the state's evidence, it could have concluded that appellant did not reasonably believe he was in imminent danger of death or bodily harm when he shot the victim.

**{¶47}** The jury was also free to reject appellant's claim that he may have been afraid of the victim at the time of the incident because of the victim's behavior as he approached the backdoor. Like appellant's interviews with the detective, the jury viewed surveillance footage of the incident and observed the victim's demeanor immediately prior to the incident and heard how the incident transpired. As noted above, the jury was in the best position to judge whether appellant's testimony coincided with the video evidence. *Clemmons*, 2020-Ohio-5394 at ¶ 15. A reasonable juror could have similarly concluded that appellant was not afraid of the victim based upon his previous interactions with the victim. That is, although appellant testified that he believed the victim slashed his tire and attempted to break Amber's window the night before the incident, he acknowledged that his belief was unsubstantiated.

**{¶48}** Moreover, the state presented evidence that, if believed, demonstrated that appellant's actions were greatly disproportionate to any threat the victim posed. Specifically, the state presented evidence that the victim did not possess a weapon at the

time of the incident, did not attempt to break into the home, and did not approach the home in an aggressive manner. Although the victim engaged in a verbal altercation with appellant, appellant's response of shooting the victim four times through the locked wooden door was unreasonable given the circumstances. *See State v. Shane*, 63 Ohio St.3d 630 (1992), paragraph two of the syllabus ("Words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations"); *State v. Angel*, 10th Dist. Franklin No. 19AP-771, 2021-Ohio-4322, ¶ 87 ("'jumping around' and 'talking trash' to appellant in an aggressive manner is not a provocation reasonably sufficient to incite an ordinary person to use deadly force").

{¶49} Given the contradictory evidence presented at trial, the jury was in the best position to weigh the evidence and to judge the credibility of appellant's alleged fear at the time of the incident. *State v. Merriweather*, 12th Dist. Butler CA2016-04-077, 2017-Ohio-421, ¶ 32. It is not against the manifest weight of the evidence when a trier of fact believes the testimony of the state's witnesses. *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882, ¶ 13. While appellant testified in his defense that the victim was shouldering the door while threatening appellant and Amber, it is apparent the jury found that portion of his testimony unbelievable. As noted above, it is the province of the jury to make credibility determinations. The jury is free to believe or disbelieve the testimony of any witness at trial. *State v. Erickson*, 12th Dist. Warren No. CA2014-10-131, 2015-Ohio-2086, ¶ 42.

{¶50} In light of the above, and when considering the totality of the evidence presented at trial, we find the state proved beyond a reasonable doubt that appellant was not acting in self-defense when he repeatedly shot the victim at close range. Therefore, we conclude that the jury did not clearly lose its way and create such a manifest miscarriage of justice that appellant's conviction must be reversed.

{¶51} Appellant's second assignment of error is overruled.

{¶52} Judgment affirmed.


M. POWELL, P.J., and BYRNE, J., concur.