[Cite as *State v. Dyer*, 2023-Ohio-544.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-36 |
| | : | |
| v. | : | Trial Court Case No. 21 CRB 00888 |
| | : | |
| CARMEN L. DYER | : | (Civil Appeal from Municipal Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 24, 2023

. . . . . . . . . . .

DANIELLE E. SOLLARS, Attorney for Appellee

TRAVIS L. KANE, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Carmen Dyer, appeals from her conviction on one count of domestic violence. According to Dyer, her conviction was supported by insufficient evidence because no evidence of physical harm was presented at trial and she did not attempt to physically harm her daughter (N.D.) Instead, Dyer argues that her

only purpose in acting as she did was to get N.D. out of the house.

{¶ 2} After construing the evidence in the State's favor, we conclude that any rational juror could have found that Dyer knowingly attempted to cause N.D. physical harm. While Dyer testified that her only purpose that day was to remove N.D. from the house and that she did not attempt to harm N.D., the arresting officer saw Dyer dragging N.D. by her hair, clothes, and book bag. The jury was entitled to find the officer's testimony credible.

{¶ 3} Furthermore, Dyer's purpose was irrelevant in this context, as the culpable mental state for the pertinent charge (a violation of R.C. 2919.25(A)) was "knowingly." R.C. 2901.22(B), which defines culpable mental states, distinguishes between acting "knowingly" and a defendant's purpose in committing a particular act. Sufficient evidence existed to show that Dyer knowingly attempted to cause physical harm to her daughter.

{¶ 4} Accordingly, the judgment of the trial court will be affirmed.


I.  Facts and Course of Proceedings

{¶ 5} On September 9, 2021, the Greene County Sheriff's Department arrested Dyer for domestic violence, a violation of R.C. 2919.25(A). The charge was a first-degree misdemeanor, and Dyer was ordered to appear in Xenia Municipal Court on September 10, 2021. During an arraignment on that date, Dyer pled not guilty, and the court ordered that she be released from jail. The court also released Dyer on her own recognizance and set an attorney status hearing for September 17, 2021. In addition,

Dyer was notified that the court had issued a protection order against her on behalf of the alleged victim, N.D.

{¶ 6} On September 14, 2021, an attorney entered an appearance for Dyer and waived the time limits for bringing her to trial. Subsequently, on December 1, 2021, Dyer filed a motion to vacate the protection order. After a hearing, the judge vacated the order on December 8, 2021. The case was then tried to a jury on March 10, 2022, and the jury found Dyer guilty of domestic violence as charged.

{¶ 7} On March 24, 2022, Dyer filed a motion to set aside the guilty verdict pursuant to Crim.R. 29(C). Dyer contended that the evidence was insufficient to sustain the verdict. After the State responded, the court overruled the motion. On May 2, 2022, the court sentenced Dyer to 90 days in jail and suspended the sentence, conditioned on the fact that Dyer not have any similar violations within a two-year period. The court did not impose a fine but ordered Dyer to pay the costs of the action. Dyer timely appealed from the judgment.

## II. Sufficiency of the Evidence

{¶ 8} Dyer's sole assignment of error states that:

> The Conviction Must be Reversed Because It is Against the Sufficiency of the Evidence.

{¶ 9} As noted, Dyer contends that her conviction was supported by insufficient evidence because the State failed to establish that N.D. suffered physical harm and because Dyer's purpose in acting was to remove N.D. from the house, not to harm her.

{¶ 10} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10. In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶ 11} Dyer was charged with having violated R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." The statute thus penalizes either causing or attempting to cause physical harm. " 'Physical harm to persons' " is statutorily defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).[1]

{¶ 12} "[I]n order to convict [a defendant] of domestic violence the State is not

---

[1] We note that R.C. 2901.01 was recently amended, with the effective date of the amendments being April 3, 2023. However, the definition of physical harm was not changed. *See* Am. Sub.S.B. 288, 2022 Ohio Laws 160.

required to prove that the victim suffered physical harm. Defendant's attempt to cause physical harm is sufficient to constitute the offense." *State v. Younker*, 2d Dist. Darke No. 2002-CA-1581, 2002-Ohio-5376, ¶ 23, citing *State v. Nielsen*, 66 Ohio App.3d 609, 612, 585 N.E.2d 906 (6th Dist.1990). "The fact that [a defendant] lacked a specific intent to cause physical harm is of no consequence, because R.C. 2919.25(A) only requires that the offender act 'knowingly.' " *Id.*

{¶ 13} Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 14} The evidence at trial, construed most favorably to the State, was as follows. On September 9, 2021, between 7:00 a.m. and 7:30 a.m., Deputy Luke Craft, a patrol officer for the Greene County Sheriff's Department, was dispatched to Dyer's home in Xenia Township, Ohio. Transcript of Proceedings ("Tr."), p. 9-12. The nature of the call was that a mother needed her daughter to get ready for school and the daughter was refusing. It was also a medical call. *Id.* at p. 12.

{¶ 15} When Craft arrived, he met Dyer outside, and she explained what was going on. *Id.* Dyer said she was not feeling well and needed to go to the hospital to get checked out. *Id.* at p. 13. Dyer also stated that her daughter, N.D., who was 17, was refusing to get ready for school, and Dyer needed Craft's assistance to make N.D. go to school. *Id.*

{¶ 16} At that point, Craft explained to Dyer that the police cannot physically make

a child go to school. Craft then went into the house and went to N.D.'s room. He told N.D., "Let's get ready for school, your mom doesn't feel well and she needs to go to the hospital." *Id.* at p. 14-15. At the time, Craft observed that N.D. was getting ready for school and was putting on her shoes and doing her hair. *Id.* at p. 15. Craft then left N.D.'s room and told Dyer that N.D. was getting ready for school. He also said that if Dyer needed to go to the hospital, he would make sure N.D. got to school. *Id.*

{¶ 17} Dyer was unhappy because N.D. was not getting ready for school, and she told Craft to make N.D. go to school. Craft explained that N.D. was getting ready, but it was going to take a second. *Id.* Craft could tell that Dyer was aggravated that the process was not going quickly enough. Dyer's voice was elevated when she was talking, and he could tell Dyer was unhappy with him. *Id.* at p. 15-16.

{¶ 18} At that point, Craft intended to drive N.D. to school; he also could have had a family member come to get N.D. However, Dyer then went into N.D.'s room, and Craft followed her. Tr. at p. 16. When Craft got into the room, Dyer was holding N.D.'s book bag and was trying to pull N.D. out of the room. There was a little resistance from N.D. at that time. *Id.* at p. 16-17. Craft reached around and tried to break it up, and N.D. was pushed into a cabinet. A mirror also fell when N.D. was pushed. It was a forceful shove into the wall. *Id.* at p. 51. Craft then called for another police unit to come out. *Id.* at p. 17.

{¶ 19} After this happened, Craft separated Dyer and N.D., and had a brief conversation with Dyer outside the bedroom. He told Dyer that she needed to stop or she was going to go to jail. *Id.* at p. 20. In response, Dyer said, "If I have to go * * * to

jail, * * * then I'll have to go to jail." *Id.* At that time, N.D. was still in her bedroom. *Id.*

{¶ 20} Dyer then went outside to cool off. Craft stayed inside for a little bit and told N.D. to make sure she got ready for school. *Id.* at p. 20-21. At that point, Craft followed Dyer outside. When he got outside, Dyer had gotten in her vehicle, which was in the driveway. Dyer said she needed to go to the hospital, and Craft told her that she could leave N.D., that N.D. was 17, and that Dyer's health was very important. He asked if Dyer wanted an ambulance to come, but Dyer said she would drive herself. *Id.* at p. 21.

{¶ 21} At that time, Dyer was asking Craft to remove N.D. from the house. She did not want N.D. home alone if she was not there. Dyer explained that N.D. would be destructive and break things. *Id.* Dyer was very frustrated, demanding that Craft remove N.D. from the house. Craft told Dyer time after time that he could not physically remove N.D. from the house and that N.D. was going to go to school. However, the process apparently was not proceeding fast enough for Dyer. *Id.* at p. 22.

{¶ 22} After Dyer last asked him to physically remove N.D. from the home, Craft remained outside. By that time, Deputy Thomas had arrived, and Craft went to brief him. While Craft was briefing Thomas, Dyer got out of her vehicle and went into the house. Tr. at p. 22. Craft then heard a scream coming from inside the house. He and Thomas swiftly went to the side door of the house. When Craft turned the corner, N.D. was on the ground and Dyer was pulling her by a combination of her book bag, jacket, and hair, trying to get her out of the house. *Id.* at p. 23. Craft observed N.D. screaming loudly. *Id.* at p. 23-24.

{¶ 23} At that point, Craft and Thomas grabbed Dyer's arms, pulled her out of the house, and put her in handcuffs. Craft told Dyer she was under arrest. *Id.* at p. 24. N.D. was very upset and crying and was very emotional. *Id.* Craft did not notice any physical injury to N.D., and N.D. did not make complaints about pain. *Id.* at p. 25 and 48.

{¶ 24} The jury was allowed to observe a brief part of Craft's body-cam (five to eight seconds), which consisted of N.D.'s screaming. *Id.* at p. 28-29 and 31-32, and State's Ex. 3. After the incident, Craft offered N.D. a protection order, but she did not want one. *Id.* at p. 48-49.

{¶ 25} Craft was the only State witness. After the State rested, Dyer testified. She stated that she had behavioral problems with N.D., who had been diagnosed with oppositional defiant disorder in July or August 2021. *Id.* at p. 64-65. Dyer testified that at times, N.D.'s behavior had been defiant and some behavior had been violent. *Id.* at 67-68. The September 9, 2021 incident was not the first time the police had been called to Dyer's home. *Id.* at p. 68.

{¶ 26} On the evening before the incident, Dyer felt pain in her arm and did not sleep that night. In the morning, she woke her children early, before 5:45 a.m., and told them to get ready for school because she needed them to get on the bus. The bus normally arrived at 6:30 a.m. Tr. at p. 71-72. Dyer needed the children to take the bus since she was in pain and was going to drive herself to the hospital. *Id.* at p. 71. When the time came for the bus to arrive, Dyer was in her car. She thought N.D. had already gone to the bus stop, which was at the corner of their block. *Id.* at 71-72. However,

when Dyer drove up to the bus stop, she realized that N.D. had not gotten on the bus and that she would have to return home. *Id.* at p. 72.

{¶ 27} Dyer thought N.D.'s action in refusing to get on the bus was intentional. On the Tuesday before the incident (which occurred on Thursday), Dyer had taken N.D. to the hospital due to concerns for N.D.'s safety. Discussions occurred about having N.D. stay for a 72-hour watch, but it was determined that N.D. would come home and would not be left alone. *Id.* at p. 74-75. On Wednesday, when Dyer and N.D. met with N.D.'s probation officer, N.D.'s phone was confiscated, and N.D. was upset about that. *Id.* at p. 75. The domestic violence incident occurred the next day, on Thursday.

{¶ 28} When Dyer returned home from the bus stop, N.D. said she was not going to leave the house until Dyer gave her the phone back. *Id.* at p. 76. Dyer refused and contacted the police three times before someone arrived. *Id.* at p. 76-79. N.D. did not begin to get ready until the third time that the police had been called. *Id.* at p. 79. When Deputy Craft arrived, N.D. had only partially dressed, and Dyer was waiting outside in her car because she was ready to go to the hospital. *Id.* at 78-79. Dyer was frustrated and mad. *Id.* at p. 79.

{¶ 29} According to Dyer, after Craft stated that he could not physically remove N.D., Dyer said, "if you can't remove her, then I will." *Id.* at p. 83. Dyer then walked into N.D.'s bedroom and grabbed N.D.'s book bag to pull N.D. out of the room. Dyer stated that N.D. resisted, and when she (Dyer) let go of the book bag, N.D. fell back and hit the nightstand. In contrast to Craft's testimony, Dyer denied that she had pushed N.D. *Id.* at p. 83-85. Dyer also denied that she was trying to hurt N.D. *Id.* at p. 85.

{¶ 30} Dyer further said that after she left the house, Craft immediately followed her outside, leaving N.D. alone in the house.   Tr. at p. 85-86.   As a result, Dyer went back into the house.   *Id.* at 86.   As to why she went back inside, Dyer said:

> My daughter was still in the house unsupervised, alone; not that it
> was that big of a deal but at the end of the day, the intent and purpose again
> was to get her out of the house so I could go to the hospital.

Tr. at p. 87.

{¶ 31} When Dyer went back inside, N.D. was standing by the door, ready to go to school.   N.D. had her book bag on.   *Id.* at p. 89.   Dyer again grabbed N.D. by her book bag and tried to open the door.   *Id.*   According to Dyer, N.D. then literally flung herself on the ground and fell back.   Dyer stated that she did not push N.D.   *Id.*   Dyer described what happened as N.D.'s having a temper tantrum, part of which involved screaming. Dyer also testified that this was not abnormal.   *Id.* at p. 89-91.   In addition, Dyer said that Deputy Craft had testified untruthfully and had concocted the testimony that she had hold of N.D.'s hair.   *Id.* at p. 103-104.

{¶ 32} Dyer admitted that she had never explained to Craft why she wanted her daughter out of the house and had not expressed concern to him over N.D.'s harming herself.   *Id.* at p. 97-98.   Dyer stated that she had not explained anything to Craft; she was just trying to get N.D. out of the house.   *Id.* at p. 98.

{¶ 33} In contending that insufficient evidence existed, Dyer notes that there was no evidence of physical harm and that she did not attempt to cause harm; she was merely attempting to get her daughter out of the house.   The State agrees there was no evidence

of actual physical harm.

{¶ 34} However, the State contends that removing N.D. from the house concerns Dyer's purpose instead of the culpability requirement of acting knowingly. In particular, the State argues that a defendant's purpose in committing an act is legally different from whether the defendant acted knowingly. The State also points out that a conflict in evidence existed. Specifically, while Dyer claimed that N.D. threw herself on the ground and that she did not grab anything other than the book bag, Deputy Craft testified that Dyer was pulling N.D. by the book bag, jacket, and hair and was dragging N.D.

{¶ 35} Upon consideration, we agree with the State. As previously noted, "[t]he fact that Defendant lacked a specific intent to cause physical harm is of no consequence, because R.C. 2919.25(A) only requires that the offender act "knowingly." *Younker*, 2d Dist. Darke No. 2002-CA-1581, 2002-Ohio-5376, at ¶ 23. Consequently, Dyer's purpose in trying to remove N.D. from the house was irrelevant. The important factor was whether Dyer knowingly attempted to cause harm. As noted, "[a] person acts knowingly, *regardless of purpose*, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." (Emphasis added.) R.C. 2901.22(B).

{¶ 36} In light of Deputy Craft's testimony, any rational juror could have found that Dyer acted knowingly for purposes of the domestic violence statute when she dragged N.D. by her hair, coat, and jacket. Regardless of whether the purpose in these acts was legitimate, someone dragging another person by the hair would be aware that physical

harm could probably result.

**{¶ 37}** Based on the preceding discussion, Dyer's sole assignment of error is overruled.

### III.   Conclusion

**{¶ 38}** Dyer's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and EPLEY, J., concur.