[Cite as *State v. Agnew*, 2024-Ohio-295.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-12-118 |
| | : | O P I N I O N |
| - vs - | | 1/29/2024 |
| | : | |
| WILLIAM T. AGNEW, | : | |
| Appellant. | : | |


APPEAL FROM BUTLER COUNTY AREA I COURT
Case No. CRB2100273A/B


Mark W. Raines, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John Heinkel, Assistant Prosecuting Attorney, for appellee.


**BYRNE, J.**

{¶ 1} William T. Agnew ("Agnew") appeals from his conviction for domestic violence in the Butler County Area I Court.[1] For the reasons that follow, we affirm.

---

[1] Butler County Area I Court is part of the county court district. In Butler County, the county court has been divided into three areas of separate jurisdiction (Areas I, II, and III). See R.C. 1907.15.

## I. Factual and Procedural Background

{¶ 2}    In April 2021, a constable with the Oxford Township Police Department filed complaints charging Agnew with two crimes: (1) domestic violence, in violation of R.C. 2919.25(A); and (2) assault, in violation of R.C. 2903.13(A).   The complaints alleged that on April 18, 2021, Agnew punched Nathaniel Agnew ("Nathaniel"), whom the complaints described as Agnew's "half brother and household member."   The matter proceeded to a bench trial.   We will summarize the key trial testimony below.

### A. State's Witnesses

### 1. Nathaniel Agnew's Testimony

{¶ 3}    Nathaniel testified that he was Agnew's half-brother; they shared the same mother but had different fathers.   On April 18, 2021, Nathaniel was living in the home located at 5861 Taylor Road in Oxford, Ohio.   Agnew was living in the home too; specifically, Agnew had been staying on the couch in the living room.   Other family members and Nathaniel's girlfriend were also living in the home.

{¶ 4}    That day, the residents of the home were having a family barbecue.   Nathaniel was outside, participating in the barbeque.   Agnew was inside the home, not participating in the barbeque.

{¶ 5}    Nathaniel testified that he went inside the home to use the bathroom.   He entered the home through its side door.   The side door led directly to the living room, where Agnew had, for some time, been staying on the couch.   After Nathaniel entered the home through the side door, Agnew pushed Nathaniel.   The push caused Nathaniel to fall over one of Agnew's guitar stands, which was in the middle of the living room.

{¶ 6}    Nathaniel got up and demanded to know why Agnew had pushed him.   They began yelling at each other.   Nathaniel recalled that Agnew said, "why did you have to use my door?"   Nathaniel explained that Agnew felt like the home's side door was "his door"

because Agnew had been staying in the living room.

{¶ 7}   Alyssa, Nathaniel's niece, then came into the living room and asked Agnew why he pushed Nathaniel.  Agnew began cursing at Alyssa.  Agnew then said, "let's take this outside."

{¶ 8}   Nathaniel testified that he walked out of the home's back door while Agnew walked out of the side door.  Then, Nathaniel and Agnew met at the back door area and were yelling at one another.  Agnew then punched Nathaniel in the face with a closed fist.  After being punched, Nathaniel backed away from Agnew.  Nathaniel denied throwing any punches or attacking Agnew in any way during the incident.

## 2. Testimonies of Alyssa Riley Baker and Crystal Kay Anderson

{¶ 9}   Alyssa Riley Baker, who is Nathaniel and Agnew's niece, and Crystal Kay Anderson, who is Nathaniel's sister, both testified.  Both largely corroborated Nathaniel's account of the incident.  Both confirmed that Nathaniel did not act aggressively towards Agnew and did not throw or threaten to throw any punches at Agnew.

{¶ 10} Crystal testified that it was she who told Nathaniel and Agnew to "take it outside."  She did not "want it in the house," referring to the ongoing aggressive interaction between the two.

## 3. Constable David Paul Geiger's Testimony and Video Evidence

{¶ 11} David Paul Geiger testified that he was a constable with the Oxford Township Police Department.  Constable Geiger responded to 5861 Taylor Road after dispatch advised him of a call received indicating that "uncles were fighting at that address."  After he arrived, he spoke with Agnew, Nathaniel, and the witnesses.

{¶ 12} Agnew told Constable Geiger that his family had been harassing him all day long and that he had "finally had enough of it."  Agnew said that Nathaniel came into the home through the "wrong door," that an argument had ensued, and then Agnew and

Nathaniel were in a fight at the back of the home. Agnew admitted to striking Nathaniel. Agnew did not say he was struck by Nathaniel.

{¶ 13} Alyssa stated to Constable Geiger that she had recorded the incident on her cell phone. Because he could not transfer the video file, Constable Geiger used his body camera to record video of the incident while it played on Alyssa's cell phone.

{¶ 14} The state introduced this recording of the cell phone video into evidence. The brief video depicts Agnew and Nathaniel outside the home. Agnew is behaving aggressively and "chesting up" to Nathaniel. During the entirety of the interaction, Agnew is always moving towards Nathaniel while Nathaniel is constantly moving backwards. Ultimately, Agnew punches Nathaniel once in the head, knocking Nathaniel's hat off his head.

### B. Defense's Case

### 1. William Agnew's Testimony

{¶ 15} Agnew testified that on April 18, 2021, he was living at 5861 Taylor Road, where he had lived for two or three years. On that day, he was "minding my own business" working on his laptop in the living room. He started hearing laughter and words that he perceived as "poking fun at me or making fun at me." Eventually, he asked Nathaniel about why he kept hearing the word, "Obama."

{¶ 16} Agnew said that his family was aware of his sensitivity over that word. Nathaniel told him that they were not saying "Obama" but were saying "Lava." Afterwards, Agnew walked back inside and continued working on his laptop.

{¶ 17} Agnew later began hearing "Obama" again, and laughter. Then, Agnew testified, Nathaniel "charged" through the side door of the house and was "coming at me" like he was "going to * * * strike me or something like that." Then, all the "girls like butted in," and rushed into the room. He did not recall if he pushed Nathaniel. He asked Nathaniel why he used the side door to enter the home.

- 4 -

{¶ 18} Then, at some point, someone said to "take it outside." Someone also told Nathaniel to "go get him." Agnew and Nathaniel then left the home. Agnew left through the side door and Nathaniel left through the back door.

{¶ 19} They met in the back of the home. Agnew told Nathaniel he did not understand why the family had a problem with him. He felt like "we were going to get into a fight or a fistfight." He felt threatened and then he punched Nathaniel. Agnew agreed with his defense counsel's characterization that he and Nathaniel were in "mutual combat."

{¶ 20} On cross-examination, Agnew claimed that Nathaniel "challenged" him to fight and that he accepted that challenge. Agnew testified that outside the home, it was Nathaniel who approached him.

{¶ 21} Agnew acknowledged the video of the incident but claimed that it did not depict everything that happened and did not show the part of the incident where Nathaniel approached him. He claimed that Nathaniel was "in my face and all of that." He also claimed that Nathaniel was "walking towards" him in the video, even though the video actually depicts Nathaniel backing away from Agnew.

{¶ 22} Agnew testified that he struck Nathaniel because he believed that Nathaniel was going to strike him. He could not recall whether Nathaniel ever attempted to punch him, but admitted that Nathaniel did not in fact ever strike him.

## C. Verdict

{¶ 23} The magistrate returned a guilty verdict on the domestic violence charge and, at the state's request, dismissed the assault charge. Agnew filed an objection to the decision finding him guilty, arguing that there was insufficient evidence presented to convict him. The trial court overruled the objection.

{¶ 24} Agnew appealed, raising two assignments of error.

## II. Law and Analysis

## A. Evidence of Residency

{¶ 25} Agnew's first assignment of error states:

THE TRIAL COURT ERRED IN FINDING DEFENDANT GUILTY AS EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE DEFENDANT AND VICTIM WERE RESIDING TOGETHER OR HAD RESIDED TOGETHER.

{¶ 26} Agnew contends that the state submitted insufficient evidence as a matter of law to allow a reasonable factfinder to convict him of domestic violence. Specifically, he contends that there was insufficient evidence to support a finding that he resided with or had resided with Nathaniel.

### 1. Legal Standard – Sufficiency of the Evidence

{¶ 27} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

### 2. Evidence Supporting Finding that Nathaniel and Agnew Resided Together

{¶ 28} The state charged Agnew with domestic violence, in violation of R.C. 2919.25(A). That statute provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." In relevant part, R.C. 2919.25(F)(1) defines "family or household member" as,

(a) Any of the following who *is residing or has resided with the offender:*

* * *

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender * * *.

(Emphasis added.)

{¶ 29} Accordingly, the state was required to present evidence that Agnew and Nathaniel were related by consanguinity or affinity and were either residing together at the time of the offense or had resided with one another in the past. R.C. 2919.25(F)(1) does not define "consanguinity" or "affinity." However, "consanguinity" refers to relationships of persons of the same blood and "affinity" refers to relationships by marriage. *See In re K.P.R.*, 197 Ohio App.3d 193, 2011-Ohio-6114, ¶ 24 (12th Dist.)

{¶ 30} In his appellate brief, Agnew concedes that Nathaniel is the "the kind of person described in O.R.C. 2919.25(F)(1)(a)(ii) * * *." Therefore, we need not analyze whether there was legally sufficient evidence to prove consanguinity or affinity, other than to note that Nathaniel testified that he and Agnew shared the same mother.

{¶ 31} We turn our focus to evidence establishing that Agnew and Nathaniel were either residing together at the time of the offense or had resided with one another in the past. Agnew argues that there was no evidence admitted at trial that he was currently living with Nathaniel. Agnew concedes that Nathaniel testified that he and Nathaniel previously resided together, but Agnew claims that Nathaniel's testimony was "unclear" and that the short duration of the time they lived together suggested that one provided the other with a "short-term place to stay with no real intent to live together."

{¶ 32} Upon review of the record, we find that the state presented evidence that was sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that Agnew and Nathaniel were residing with one another and had resided with one another.

{¶ 33} Nathaniel testified that he and Agnew had previously lived together in 2014 and 2015 for a couple months. Nathaniel further testified that in April 2021, he (Nathaniel) was living at 5861 Taylor Road in Oxford. Nathaniel testified that Agnew was "staying" at 5861 Taylor Road. Agnew had been staying there "for a few days" and was sleeping on the couch in the living room. To Nathaniel's knowledge, Agnew had no other permanent address.

{¶ 34} Crystal Kay Anderson also testified that Agnew had been "staying" at 5861 Taylor Road, and that he had been staying there "part-time."

{¶ 35} Finally, the state cross-examined Agnew and asked whether "from your perspective you had been living [at 5861 Taylor Road] for a while," and Agnew answered "Yes." When asked whether the home was his "primary and only residence," Agnew again stated, "Yes." He clarified that he had lived there for "two to three years, I believe," and he stated that he had no other residence. Agnew further testified that if he was gone from 5861 Taylor Road, it was because he was away travelling for work. When asked if 5861 Taylor Road was his "home," he answered "Yes." Agnew also testified that he lived at 5861 Taylor Road *with* Nathaniel, whom Agnew claimed had only been residing there for a few months. Agnew also testified that the living room was "sort of like my temporary area." When discussing what occurred in the living room in his interaction with Nathaniel, Agnew referred to it as "my room."

{¶ 36} Thus, the record contains an abundance of evidence that Agnew and Nathaniel had not only resided together in the past but were currently residing together at 5861 Taylor Road on the date in question.

{¶ 37} Agnew argues that the evidence of when he and Nathaniel lived together in the past was "unclear." We do not find it unclear. Nathaniel unequivocally stated that he and Agnew resided together.

{¶ 38} Agnew also argues that the short duration of the time he and Nathaniel resided together in 2014 and 2015 calls into question whether either party intended to permanently reside where they were living. However, the domestic violence statute does not place any temporal requirements on the time the offender and victim must reside together. *State v. Montgomery*, 12th Dist. Clermont No. CA2019-02-016, 2019-Ohio-3831, ¶ 13. In *Montgomery*, we held that R.C. 2919.25(F)(1) provides no specific time as to when the "residing" must occur and that the statute merely requires that the offender and victim lived together at some point in time. *Id.*, citing *State v. Turner,* 8th Dist. Cuyahoga No. 102984, 2016-Ohio-813, ¶ 19. There was sufficient evidence to prove that Agnew and Nathaniel resided together.

{¶ 39} For these reasons, we overrule Agnew's first assignment of error.

### B. Intent to Injure and Self-Defense

{¶ 40} Agnew's second assignment of error states:

> THE TRIAL COURT'S FINDING OF GUILTY WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE APPELLANT WAS GUILTY BECAUSE APPELLANT DID NOT INJURE HIS BROTHER AND DID NOT INTEND TO INJURE HIS BROTHER, BUT INSTEAD ACTED IN SELF-DEFENSE.

{¶ 41} Agnew next argues that there was insufficient evidence to convict him of domestic violence because he "did not intend to injure [Nathaniel], but instead acted in Self-Defense." Agnew states that "Intent is an essential element of the crime of domestic violence" and that "When a defendant acts in self-defense or believes he is acting in self-defense he does not have the intent to commit the crime." Agnew points to his testimony that he felt threatened by Nathaniel and his claim that Nathaniel challenged him to fight.

{¶ 42} Agnew cites no legal authority for his statement that "Intent is an essential element of the crime of domestic violence." The plain language of the statue belies this assertion. As set forth previously, to convict Agnew of domestic violence, the state was

required to prove that he "*knowingly* cause[d] or attempt[ed] to cause physical harm to a family or household member." R.C. 2919.25(A). Therefore, "knowingly" is the requisite mens rea to prove a violation of R.C. 2919.25(A). The Revised Code defines "knowingly" as,

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 43} Based on the definition of "knowingly," the state was not required to prove specific intent to cause physical harm in order to support a conviction for domestic violence. *State v. Dyer*, 2d Dist. Greene No. 2022-CA-36, 2023-Ohio-544, ¶ 12 (noting that the fact that a defendant lacked a specific intent to cause physical harm in a domestic violence offense was of no consequence because R.C. 2919.25[A] only requires the mind state of "knowingly"); *State v. Stover*, 8th Dist. Cuyahoga No. 104388, 2017-Ohio-291, ¶ 14 ("The requisite culpability for domestic violence is 'knowingly.' 'Knowingly' does not require the defendant to have a specific intent to cause a certain result; rather, that is the definition of 'purposely.'").

{¶ 44} Contrary to Agnew's argument, "intent" is not an "essential element of the crime of domestic violence." Therefore, Agnew's argument that his conviction was not supported by sufficient evidence because he "did not intend to injure" Nathaniel lacks merit.

{¶ 45} Agnew's next argument is that he was acting in self-defense and that the state failed to meet its burden of proving beyond a reasonable doubt that he did not act in self-

defense. However, Agnew did not argue self-defense at trial and did not request that the trial court consider a self-defense theory. He is therefore limited to a review for plain error. *See State v. Parnell*, 10th Dist. Franklin No. 11AP-257, 2011-Ohio-6564, ¶ 9 (applying plain error review where the appellant did not request a self-defense jury instruction).[2]

{¶ 46} Crim.R. 52(B) provides that "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." That rule "places three limitations on a reviewing court's decision to correct an error not raised before the trial court." *State v. Fuell*, 12th Dist. Clermont No. CA2020-02-008, 2021-Ohio-1627, ¶ 70, citing *State v. Barnes*, 94 Ohio St. 3d 21, 27 (2002). "First, an error, 'i.e., a deviation from a legal rule,' must have occurred." *Fuell* at *id.*, quoting *Barnes* at 27. "Second, the error complained of must be plain, i.e., it must be 'an "obvious" defect in the * * * proceedings.'" *Id.* Stated otherwise, the error must be fundamental, palpable, and obvious on the record such that it should have been apparent to the court without an objection. *State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 30. "Third, the error must have affected 'substantial rights.'" *Fuell* at ¶ 70, quoting S*tate v. Martin*, 154 Ohio St.3d 513, 2018-Ohio-3226, ¶ 28. This means the error must have affected the outcome of the proceedings. *Barnes* at 27. An appellate court will take notice of plain error with "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12.

{¶ 47} On appeal, Agnew does not argue plain error in his appellate brief. "[I]t is not

---

2. We also note that Agnew includes his self-defense argument in an assignment of error challenging the sufficiency of the evidence. However, because self-defense is an affirmative defense, it is not considered in a sufficiency-of-the-evidence analysis, but is instead only considered in a review of the manifest weight of the evidence. *State v. Ballein*, 12th Dist. Fayette No. CA2021-10-022, 2022-Ohio-2331, ¶ 32. Regardless, for the reasons described below, the result would not change had Agnew properly presented this argument in a challenge to the weight of the evidence.

our duty to construct a plain error argument on his behalf." *State v. Oghojafor*, 12th Dist. Butler No. CA2021-07-080, 2023-Ohio-44, ¶ 104. We therefore decline to construct a plain error argument as to why the court erred by failing to consider self-defense.

{¶ 48} In any event, no plain error occurred here. Pursuant to R.C. 2901.05(B)(1), in any case where evidence is presented that "tends to support" that a person acted in self-defense, the state is required to disprove one of the elements of self-defense beyond a reasonable doubt. *State v. White*, 12th Dist. Butler No. CA2019-07-118, 2020-Ohio-3313, ¶ 42. Here, Agnew admitted that he struck Nathaniel and that Nathaniel did not strike him. All the witnesses corroborated Nathaniel's claim that he was not the aggressor, which was further confirmed by the video of the altercation. For these reasons there was no "obvious defect" in the court not sua sponte considering a self-defense theory. *Barnes*, 94 Ohio St.3d at 27. We overrule Agnew's second assignment of error.

Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.